## FORD *et al. v.* DELTA & PINE LAND CO.

### (*Circuit Court, S. D. Mississippi.* August 18, 1890.)

**1. TAXATION—EXEMPTION—CONSTRUCTION.**
An exemption from taxation of the capital stock and "all the property and effects" of a railroad company will not be extended by implication to outlying and detached lands which the corporation had no power to acquire when the exemption was granted, but which were acquired under a power granted by the subsequent charter.

**2. SAME—CONTRACT.**
Act. Miss. Feb. 13, 1867, (liquidating levee law,) levying a tax on the lands in the levee district for the payment of the levee bonds, and providing that, in case of default, the land should be sold, constituted a contract between the state and the bondholders that the taxes collected, and the lands purchased by the levee commissioners for default in the tax, should be held for the payment of the bonds.

**3. TAX-TITLES—CURATIVE STATUTE.**
Though the act provided that all the land on which the tax was not paid before a certain day in each year should on that day be sold for said taxes, such lands might thereafter be sold for such taxes, and the irregularity cured by act of the legislature.

**4. PROCESS—RETURN CURED BY JUDGMENT.**
A return of process, defective on its face, in that it does not show the relation of the person served to the defendant corporation, is cured by a recital in the judgment that the defendant had been duly and legally served with process.

**5. CORPORATIONS—DISSOLUTION.**
Code Miss. 1880, § 1038, provides that the franchise of a railroad corporation may be sold to satisfy a judgment, the purchaser to have the rights and duties given and imposed by the charter. Section 1039 allows six months for redemption. Section 1041 provides that all corporations, after their charters have expired or been annulled, shall nevertheless be continued bodies corporate for three years thereafter for the purpose of suing and being sued and closing up their business. *Held,* that, where a railroad company franchise was sold with the rest of the property on a decree of foreclosure, and the purchasers organized a new corporation under an act of the legislature, the old corporation ceased to exist at the end of three years thereafter.

**6. LIEN OF JUDGMENT—CONTINUANCE.**
Code Miss. 1880, § 2674, provides that all actions on a judgment or decree rendered in the state must be brought within seven years thereafter. It further provides that no execution shall issue on such judgment or decree after seven years from the date of the last preceding execution, but it makes no provision for the continuance of the lien of the first judgment. *Held,* the rendition of a judgment on a judgment did not continue the lien of the first judgment.

In Equity.

Code Miss. 1880, § 1038, provides that the franchise of a railroad corporation may be sold to satisfy a judgment. Section 1039 allows six months for redemption. Section 1041 provides that all corporations, after their charters have expired or been annulled, shall nevertheless be continued bodies corporate for three years thereafter for the purpose of suing and being sued and closing up their business.

*Whitfield & Sullivan* and *Ed. Mayes,* for complainant.

*Frank Johnson* and *James R. Yerger,* for defendants.

HILL, J. This cause is submitted upon bill, answers, exhibits, and proofs, and argument of the counsel. The pleadings and proofs are exceedingly voluminous, but, after having been carefully examined and considered, they show the following facts:

On the 23d day of November, 1859, an act was passed by the legislature of this state "to incorporate the Memphis, Holly Springs & Mobile

Railroad Company," by the first section of which the corporation proposed to be chartered was authorized to purchase, receive, hold, and enjoy real and personal estate, and the same to retain to them, their successors and assigns, so far as it may be necessary for their accommodation and convenience in the transaction of their business, and such as may in good faith be conveyed to them by way of security, or satisfaction of debts, or by donation; and the same to sell, grant, or otherwise dispose of, provided said company shall not be allowed to have in their own name, or in any other manner, for their use and benefit, more land than is necessary for the convenience of their railroad therein provided for; including the right of way and grounds proper and necessary for depots, fixtures, and buildings, pertaining to said road, for a longer period than five years after the completion of said road, on pain of forfeiture to the original owners of such lands, all right and title thereto. The nineteenth section of this act enacts that the capital stock and all the property and effects of said company shall be exempt from taxation until said road is completed, provided it is commenced within two years and completed within ten years from and after the passage of this act. Acts 1859–60, pp. 51–60. Nothing more is shown to have been done until the 26th of February, 1867, when the legislature passed "An act to revive and amend the act of incorporation of the Memphis, Holly Springs & Alabama Railroad Company," by the first section of which it is provided that the above-recited act is revived, and that the style of the railroad company shall hereafter be known as the "Memphis, Holly Springs, Okolona & Selma Railroad Company." The second section of this last act provides that the company shall have three years in which to complete their road after the passage of the act. The third section of the act authorized the corporators to receive subscriptions in land to the capital stock of the company, provided the land shall be in five miles of the line of road, and shall be estimated at its cash value by three disinterested persons, and shall be taken by the company at their valuation, unless objected to as excessive, in which event there shall be a re-estimate by three persons appointed by the judge of the probate court of the county in which the land may lie. These lands were to be conveyed to the company with covenants of valid title, and the persons making the subscription were to pay all the costs of the valuation and conveyance, and 10 per cent. on the amount subscribed, in the same installments granted to those who subscribed for stock in money, and for the amount of said stock both in land and money he shall be entitled to receive certificates of stock as in other cases. The next section provides that nothing in the act shall be construed to prevent the state from levying and collecting such income taxes or tax upon the travel on said road as might be provided from time to time by law. Acts 1866–67, p. 654. On the 21st day of July, 1870, there was passed an act changing the name of this railroad company to that of the Selma, Marion & Memphis Railroad Company, and said company was authorized to receive, in the way of subscription to its capital stock, lands lying anywhere within the state of Mississippi. On the 16th day of March, 1872, there was passed an

act to facilitate the construction of the Selma, Marion & Memphis Railroad, by the third section of which it was enacted that all lands which had before that time been purchased by or forfeited to the state of Mississippi for taxes due and unpaid thereon, and which have been sold to said Selma, Marion & Memphis Railroad Company by the original owners of the same, shall be sold to said railroad company by the auditor of public accounts at two cents per acre, upon the presentation of satisfactory evidence of titles to said land to said railroad company from original owners, and satisfactory proof that not less than twenty-five miles of said road has been constructed: provided, the title to the lands shall have been conveyed by said owners to said company prior to the passage of the act, and that in all cases where the said lands had been forfeited to or purchased by any of the levee boards in the levee districts in this state in which any of the lands lie, and are now held or claimed by the levee boards for the non-payment of levee taxes, and where the title is held by said railroad company, said levee boards are required to arrange for the payment of said taxes by receiving, in payment of the same, any of the bonds of the levee board. Acts 1872, p. 313. On the 18th day of March, 1873, the Selma, Marion & Memphis Railroad Company paid to the auditor of the state two cents per acre for the lands embraced in this suit, and took from him deeds of conveyance therefor. This railroad company was consolidated with the Selma, Marion & Memphis Railroad Company of Tennessee and Alabama, and this consolidation was ratified by an act of the legislature passed on the 6th day of March, 1873, entitled "An act to amend the charter of the Selma, Marion & Memphis Railroad Company." No previous law was passed authorizing the consolidation, nor does it appear upon the face of the ratifying act under what charter the consolidation took effect, or what were the rights, privileges, and immunities accorded to the company by the act of consolidation. Acts 1873, p. 570.

The lands involved in this suit are those claimed to have been purchased from the original owners under the act of July 21, 1870, which authorized the purchase of lands situate in any part of the state of Mississippi, and under the provisions of the act of 16th of March, 1872, authorizing the sale by the auditor to the railroad company, at two cents per acre. The title to the other lands held by the company need not, therefore, be considered. It is admitted that the title to these lands was vested in the state of Mississippi by patents from the United States under what is known as the "Swamp-Land Act" of congress, and that the same have been entered under the act of the legislature of this state approved March 2, 1854, entitled "An act to provide for the further issue of swamp-land scrip, for the purpose of aiding in the completion of the levees upon the Mississippi river," and that patents have been issued therefor to the enterers thereof. The title-deeds, filed as evidence in the cause, show that the parties or their assignees have conveyed to the Selma, Marion & Memphis Railroad Company most of the lands described in the bill. The greater part of these conveyances bear date at different times during the year 1871. The deeds recite that the lands

described in them were sold and conveyed in payment for capital stock in said railroad company. The deeds from the auditor of the state to the company, filed as evidence, show that these lands were forfeited to the state for non-payment of taxes, and were sold therefor, and purchased by the state, and that they were sold by the said auditor to the Selma, Marion & Memphis Railroad Company at two cents per acre, under the provisions of the act of March 16, 1872. On the 18th day of March, 1871, the Selma, Marion & Memphis Railroad Company executed and delivered to Porter King, Abram S. Humphries, and J. M. Hill its mortgage or deed of trust, conveying to them as trustees all the property, real and personal, franchises, rights, and privileges then owned by said corporation, or to be by it afterwards acquired, as security for the payment of certain bonds, with interest coupons attached, issued by the authority of the said corporation, and which were transferred to *bona fide* holders. Said King never accepted said trust, and said Humphries some time afterwards died. Their places were filled, as authorized by said mortgage or trust-deed, by the substitution of J. W. Fant and A. A. Coleman, who accepted the trust, and continued to act as trustees until said corporation ceased to perform its functions. On the 18th day of December, 1874, Luke P. Blackburn, of the state of Kentucky, who was the owner and holder of five of said bonds, being of the denomination of $1,000 each, with matured interest coupons attached, amounting to more than $500, filed his bill in the circuit court of the United States for the western district of Tennessee against said corporation and trustees and a portion of the holders of like bonds and coupons, payment of the interest thereon not having been made, for the purpose of collecting the interest so due, and, if need be, the foreclosure of said mortgage or trust-deed. The bill in that case describes or sets out the lands designated in the bill in this as being embraced in said mortgage. Such proceedings were had in said cause that on the 24th day of July, 1882, a decree was entered by the court directing Bell W. Etheridge, clerk and master of said court and commiss' )ner thereof, to sell the lands described in the mortgage and in the bill in that cause upon six and twelve months' credit, taking notes with approved sureties, and retaining a lien thereon for the purchase money. The record shows that the sale was made in pursuance to said decree, and was duly reported to and confirmed by the court. The decree ordering the sale provides and directs that, when the sale shall have been made and confirmed by the court, the said Selma, Marion & Memphis Railroad Company should be absolutely barred from all right of redemption of said lands, and that the purchasers should be vested with as full right and title thereto as was vested at any time in said company. The said sale was reported to and confirmed by the court on the 15th of May, 1883. The decree confirming the report provides and directs that Bell W. Etheridge, the clerk and commissioner, who made the sale, should, on the payment of the purchase money, make to the purchasers, respectively, a deed of conveyance to said lands so purchased by them, which should contain a covenant, and have the effect of absolutely barring the said railroad

company from all equity of redemption; and that the purchasers should thereby be invested with full right and title thereto, in as full and complete a manner as the same was vested at any time in said company. It is further directed that the trustees under the mortgage should unite in such conveyances. Deeds by Bell W. Etheridge as clerk and commissioner, in which J. W. Fant as trustee joined as directed, were executed and delivered to the purchasers of said lands, but the other two trustees, Hill and Coleman, failed to unite in such conveyances; the former being physically unable to do so, and having since died, and the latter being a non-resident of this state or the state of Tennessee. All the property conveyed in said mortgage other than the lands embraced in this suit was, by the decree of said court in that cause, sold, and the sale was confirmed, and the purchasers put in possession of the same on the 6th day of July, 1880. In the said cause of *Luke P. Blackburn* v. *The Selma, Marion & Holly Springs Railroad Company,* said company and the trustees under said mortgage or trust-deed were made and became parties to said suit, either by service of process or voluntary appearance, and the orders, decrees, and proceedings had in said cause remain unappealed from, and are in full force so far as the court had jurisdiction thereof. On the 2d day of December, 1878, Timpson & Tappan, assignees in bankruptcy of Henry Clews & Co., obtained in the district court of the United States for the northern district of Mississippi judgment against the Selma, Marion & Holly Springs Railroad Company for $481,227.98. On the 13th of November, 1885, W. H. Timpson, as the trustee in bankruptcy of said Clews & Co., brought his action in the district court of the United States for the northern district of Mississippi, founded upon the judgment recovered as aforesaid. The process was served upon R. A. Murdock, the return of the marshal being as follows: "Executed November 19, 1885, by handing to R. A. Murdock, Esq., of Okolona, Miss., a true copy of this writ;" and on June 19, 1886, judgment *nil dicit* was rendered in favor of the plaintiff against said Selma, Marion & Memphis Railroad Company for the sum of $737,-904.65. Upon this judgment executions were issued to the marshals of the northern and southern districts of Mississippi, to be levied by them upon the lands situate in their respective districts. They were by them levied on the lands herein involved, which were sold, and purchased by the complainants in this suit, to whom deeds were executed by the said marshals for those sold by each. These are all the facts deemed necessary to be stated in connection with the complainant's title and the effect of the sale made under the decree of the United States circuit court for the western district of Tennessee.

The defendants claim title under various conveyances made by county sheriffs and tax collectors and the auditor of public accounts, and under the decree of the chancery court of Hinds county, and sale and conveyance made in pursuance thereto. The facts upon which defendants rely to maintain their title, as shown by the proof, are briefly as follows: On December 2, 1858, a statute was passed by the legislature of this state for the construction of levees on the eastern bank of the Mississippi river,

to prevent the lands in what is known as the "Delta" from being over-flowed by the Mississippi river; and it was provided that the levee commissioners, created by the act, should issue bonds to be used in payment for the construction of said levees.   To provide for the payment of these bonds a tax was levied upon the lands within the levee district of a specified sum per acre, as a charge *in rem* to be paid annually to the sheriff and tax collector of the county in which the lands lay, and upon default the sheriff was to sell the land, subject to redemption within two years, and his deed was declared in advance to be *prima facie* evidence of the regularity of the sale.   Under this act a large amount of work was done, and a large number of bonds were issued.   The war intervening, but a small amount of taxes were paid, and a very large indebtedness remained due.   To provide for the payment of this indebtedness, the legislature passed the act of the 13th of February, 1867, known as the "Liquidating Levee Law," at the request and with the consent of the holders of these bonds, by and under which a readjustment of said indebtedness was had, the bondholders remitted all interest, and new bonds were issued in place of the old ones, and a specific tax of five cents per acre on a portion of said lands and three cents on the remainder was levied *in rem*, and declared to be a lien on the same, to be paid annually to the sheriff and tax collector of the county in which the land was situate, on or before the 1st day of May in each year, and, upon non-payment of the same, said sheriff and tax collector was directed to offer the lands, in default, for sale to the highest bidder for cash.   This tax was to continue and be collected until the entire debt so due was paid off and discharged. This last-named act required that all lands upon which said tax was not paid on or before the second Monday in May in each year, without further assessment or notice, should on that day be sold to the highest bidder for said tax and costs, and that the sale should vest in the purchaser a good and sufficient title against any and every person having claim thereto.   A large number of acres of these lands were sold, and, no other person bidding therefor, they were struck off to the levee commissioners by their corporate name, as the purchasers, in accordance with said act. An act of the legislature was subsequently passed constituting the auditor of public accounts and the treasurer of the state the commissioners to transact the business and perform the duties required of the former liquidating levee commissioners.   On the 26th day of February, 1877, Joshua Green, on behalf of himself and all others holding said liquidating levee bonds who might see proper to come in and make themselves parties complainant in said cause, filed his bill in the chancery court of Hinds county, in this state, against the auditor and treasurer as such commissioners, praying a sale of the lands so sold to and held by said liquidating levee commissioners and by said auditor and treasurer as their successors.   Proceedings were had in said cause, by which a large portion of said lands were sold to E. C. Gordon, who paid the purchase money therefor, and received deeds of conveyance for the same from said commissioners in pursuance to the decree of said chancery court.   This decree and sale stand unreversed.

The lands so sold and conveyed to E. C. Gordon embrace the lands in this suit, which were afterwards sold and conveyed by said Gordon to B. H. Evers. They were forfeited for non-payment of the taxes of 1882, and purchased by the state of Mississippi, and were afterwards purchased from the state by James D. Stewart, in the suit of *Watson* v. *Evers,*[1] in the district court of the United States for the northern district; and by its order and decree said lands were afterwards sold by James McKee, as special commissioner in said suit of *Watson* v. *Evers and others,* and purchased by said Thomas Watson, to whom deeds of conveyance were executed in pursuance of the order and decree of the court. They were afterwards sold and conveyed by him to the Pine & Delta Land Company, the defendants in this suit. These lands, while held in the name of the levee commissioners, were not liable to taxation for any purpose, and were not assessed for taxation; but when conveyed to Gordon, as before stated, they were assessed for taxes as other lands, and, the taxes not being paid, they were sold by the respective sheriffs and tax collectors as other lands, and were struck off and listed to the state, no one else bidding for the same, as were other lands upon which the taxes had not been paid; and, as before stated, they were sold by the state and conveyed to James D. Stewart as the receiver of this court in said cause. On March 1, 1875, the legislature passed a revenue statute, commonly called the "Abatement Act," which provided for the sale of all the lands held or claimed for taxes either by the state or any one of the levee boards. All taxes, state, county, or levee, were abated, except the taxes for the year 1874; and the only condition imposed for the former delinquency was the payment of the taxes for 1874. The sale for the non-payment of this tax was to be made on the first Monday in May, 1875. These taxes not being paid, the lands in controversy were sold by the different sheriffs and tax collectors, and, there being no bids offered by other persons, they were struck off and listed to the state and reported to the auditor. In accordance with the act of the legislature, this proceeding vested the title in the state, the land being taxable. These are all the facts that need be stated to facilitate an understanding of the numerous questions involved in this suit, and which have been ably and exhaustively presented by the counsel on both sides.

The proof fails to show that anything was done by the said railroad company under the charter of 1859, or that the conditions therein prescribed were complied with. Therefore, the effect of the charter of 1867 was substantially to create a new corporation under a new name, with the rights, powers, and privileges of the charter of 1859, and the additional provision extending the time for commencing and completing the railroad. This corporation was confined to the state of Mississippi, but with the power to consolidate with other railroad corporations, as authorized in the act of incorporation of 1859, which was not exercised until the 15th of April, 1881. It is provided in section 19 of the act of 1859, and

---

[1] See 13 Fed. Rep. 194.

is a part of the act of 1867, "that the capital stock and all the property and effects of said company shall be exempt from taxation until said railroad is completed: provided, it is commenced within two and completed within ten years," which limitation was extended by the act of 1867 to three and sixteen years. This is the only provision for exemption from taxation provided in any of the acts of the legislature. The question, therefore, is as to what was the legislative intent in respect to the exemption claimed by the said company, and how far it extended. It is true that the act uses the word "all," but I am satisfied it was only intended to embrace the property which the corporation was authorized to hold under the acts of 1867 and 1859, and did not extend or apply to such after-acquired property as was detached from the railroad and not necessary for its operation or the necessary transactions of its business, and does not embrace the lands involved in this suit. This conclusion is strengthened by the fact that the sale of the lands by the state to the railroad company under the act of 1872 for only two cents an acre was evidently intended, in addition to aiding the railroad, to subject to taxation this large body of land, which had for so long a time rendered no revenue to the state or county in which it is situated. These lands had yielded no revenue from, say, 1862 to 1871. The railroad company, by the conveyances made by the former owners to it, only obtained the right of redemption. The land was not redeemed by it, but purchased at the nominal sum of two cents per acre. It is not to be presumed that the legislature intended that lands thus sold should remain for 13 years relieved from contributing their portion of the public burdens imposed on other lands. Besides, it is the well-established rule that exemption from taxation in favor of railroad companies only embraces the property connected with the construction and operation of their railroads, and not outlying lands, or other property not necessary for their construction and operation; and I take it that, but for that word "all" used in the exemption clause, this exemption would not be claimed. By the act of the legislature authorizing the sale of said lands at two cents per acre it was upon condition that 25 miles of said railroad had been completed. This the proof shows was not then done, and never has been done, by said railroad company in this state. This failure renders the validity of such sale doubtful; but, in addition to what has been stated on this question, the proof shows the Selma, Marion & Memphis Railroad Company had, some time prior to January, 1881, ceased to construct said railroad, and was hopelessly insolvent; and that on the 19th day of March, 1881, all its property, franchise, and everything possessed by it except these lands, were sold under the decree of the circuit court of the United States for the western district of Tennessee, which remains unreversed, and under the decree of said court were turned over to the purchasers, and the railroad company foreclosed of all its right, title, and interest therein; so that practically the corporation ceased to exist after that time. The building, equipping, and operation of this road for the public convenience was the consideration for the exemption provided in the charter, and by the failure of the

corporation to build and operate the railroad the exemption has failed. It is difficult to maintain the exemption after that time. This is all that it is deemed necessary to say on the question of the exemption of the lands from taxation. The lands sold at two cents per acre were not intended to embrace lands claimed by the levee commissioners, and it may be well doubted whether the Selma, Marion & Memphis Railroad Company obtained any title under this purchase.

The next question for consideration is as to the legal effect of the sale of these lands under the decree of the circuit court of the United States for the western district of Tennessee, and the foreclosure of the right, title, and interest of the Selma, Marion & Memphis Railroad Company in them. The only question is as to the jurisdiction of the court to make the decree for the sale, for the reason that the lands are situate within this state, and not in the district of West Tennessee, or within that state. The court had jurisdiction of the parties and of the debts secured by the mortgage or trust-deed. If the court had jurisdiction, then the sale, its confirmation, and the payment of the purchase money vested a complete, equitable title to the lands in the purchaser; and the court, if the legal title has not been vested in the purchasers, has the power to cause it to be done. The validity of the sale of the other property is not questioned. It is clear that a judgment had in a court of law in one state cannot in any way affect the title to land in another state. Reference is made to the case of *Muller* v. *Dows*, 94 U. S. 444, to sustain this sale. That case is authority in point as to the property first sold in the *Blackburn Case*, as that property was an entirety; but I am of opinion it is not directly so with reference to the lands embraced in this suit. It is stated, however, in the *Muller-Dows Case*, as follows:

"It is here undoubtedly a recognized doctrine that a court of equity sitting in a state and having jurisdiction of the person may decree a conveyance by him of land in another state, and may enforce the decree by process against the defendant."

The same doctrine is held by the supreme court of this state in the case of *Richardson* v. *McLemore*, 60 Miss. 315. If a court of equity has the power to compel a conveyance of land outside the state in which the court is held, it is illogical to say that when a bill is filed to foreclose a mortgage by a railroad company covering property in several states, and all the parties are before the court, the mortgagor and the trustees in the mortgage and the bondholders, the court has not the power to decree a sale of the lands, and order the same to be made by its own commissioner, or by the trustee or trustees, and the conveyance to be made by the mortgagor or by all of them. But, as there are some doubts on this point, and there are others upon which the right of the parties may be determined with less difficulty, it will be passed without a decision the one way or the other.

The next question to be considered is as to the effect of the judgment, sale, and conveyance under which complainants assert title to the lands in controversy. It is insisted upon the part of defendants that the judgment was void for two reasons: *First*, because the return of the

marshal does not show that R. A. Murdock, upon whom the process was served, was in any way connected with the Selma, Marion & Memphis Railroad Company; and, *secondly*, because that corporation had, for years before that time, ceased to have an existence for any purpose whatever. As to the first of these objections the judgment entry recites that the court was satisfied the process had been properly executed, which must be understood to mean that it was executed upon the proper person, and this would not have been the case if Murdock was not at the time connected with the corporation in such way as that service upon him would bind the corporation. I do not believe this objection alone is maintainable if the corporation then had an existence. The more difficult question is, had the corporation itself ceased to exist before that time? If it had, no valid judgment could be rendered against it. At common law, a corporation created without limit to its existence was presumed to exist until its death was wrought by a voluntary surrender of its charter, or by the judgment of a court having jurisdiction upon a writ of *quo warranto* or otherwise. In case a corporation ceased to carry on its business, and owed debts and owned property, the remedy of the creditors was by bill in equity. Section 1039 of the said Code provides that the original corporation, or the original parties in any charter, may within six months redeem the franchise which may have been sold under execution by paying or tendering to the purchaser the amount paid by him, with 10 per cent. added thereto, but shall not be entitled to the profits received by the purchaser in the mean time; and upon such payment the title shall vest in the original owners. When such sale is made, and the franchise and property are not redeemed within the time limited, as in this case, it looks very much like the practical death of the corporation with a nominal existence for three years thereafter in order that any balance of its assets may be administered for the benefit of creditors and stockholders, as provided in section 1041 of the Code. The road-bed, franchise, and all other property connected with and necessary for the keeping in repair and operation of the road, were purchased by J. J. Busby and his associates, and they were put in possession of the same, and the purchasers and their associates organized a new corporation under the provisions of an act of the legislature of this state approved February 1, 1877, which organization took place on the 13th day of April, 1881. The Selma, Marion & Memphis Railroad Company had no existence after that date except for the purposes mentioned in section 1041 of the Code, and the existence limited and purely statutory continued for three years after that date, and ended on the 14th day of April, 1884. It is difficult under the statutes and these proceedings to come to any other conclusion than that the Selma, Marion & Memphis Railroad Company ceased to exist for any purpose after that date. The judgment under which complainants claim title was rendered on the 19th day of June, 1886, the process having been executed on the 19th day of November, 1885. The foreclosure decree as to these lands was entered on the 22d day of January, 1883. It is insisted upon the part of complainants that the judgment rendered on the 19th day of June, 1886, was but a revivor and

continuation of the judgment upon which it is founded, and that, under it, the lien of the prior judgment is continued, and that, having this continuous lien, they had a right to have the lands sold for the satisfaction of their judgment, notwithstanding the death of the corporation.   Section 2674 of the Code of 1880 provides that all actions founded on any judgment or decree rendered in this state shall be brought within seven years next after the rendition of such judgment or decree, and not after, and that no execution shall issue on such judgment or decree after seven years from the date of the issuance of the last preceding execution on such judgment or decree; but it does not provide for the continuance of the lien created by the first judgment, and I know of no rule of law which gives it that effect.   The former judgment is treated as any other ascertained debt when suit is brought upon it.   The question as to the validity of the judgment of the 19th June, 1886, is not clear and satisfactory on the one side or the other, but the reasons weigh against its validity. The defendants *first* claim title under the deeds to the levee commissioners; *secondly,* under the conveyance of the commissioners to E. C. Gordon; *thirdly,* under the conveyance of Gordon to Evers; *fourthly,* under the conveyance of McKee, commissioner, to Watson; *fifthly,* under the conveyance of the auditor to Stewart, receiver; *sixthly,* under the conveyance of Watson to them.

The first question presented is as to the validity of the title acquired by the liquidating levee commissioners or levee board.   The tax for which these lands were sold was a local and a special tax of five cents per acre on part, and three cents per acre on part, levied by the legislature, and declared by the statute to be a tax *in rem* on the lands situate in the levee district for the purpose of paying the indebtedness incurred by the general levee board prior to the year 1862.   This statute has been held valid by the supreme court of this state in the case of *Gibbs* v. *Green,* 54 Miss. 592, and *Bunch* v. *Wolerstein,* 62 Miss. 56, and in subsequent decisions.   In the cases above referred to it is said that the act of 1867 constituted a contract between the state and the bondholders, and that the taxes arising under its provisions, and the lands purchased and held by the levee commissioners, constituted a fund for the payment of the liquidating levee bonds and interest, which the legislature had no power to divert to any other purpose; that the legal title, vested in the levee commissioners by a sale and conveyance of the land for the non-payment of the taxes, was transferable at their pleasure for the purpose of paying said bonds.

Numerous exceptions are urged and taken to the validity of these sales. One of these applies to the lands in Sunflower county and portions of the lands in other counties, and is based on the fact that the lands were entered with what is known as "Swamp-Land Scrip," issued to other counties.   The contention is that scrip issued to one county could only be located on lands situate in that county, and that, when not so located, the title to the lands remained in the state, and they were not subject to taxation for any purpose.   After a careful consideration of this question I am satisfied that the objection is not well taken as to the lands in the

Yazoo Mississippi delta district. The purpose of the legislature was to furnish the scrip to the different counties along the Mississippi river to enable them to build and maintain the levees. For this purpose it was issued to Tunica and one or two other counties in which there were no swamp lands upon which it could be located; and from some reason no scrip was issued to Sunflower county, because, perhaps, it had no river front upon which to build levees. The scrip was authorized to be located on the swamp lands in the levee district. The provision of the act creating the swamp-land district east of the base of the hills bordering upon the Yazoo river and some of its tributaries is that the scrip shall be located on the swamp lands in the county to which it was issued. The purpose of the issuance of scrip to these counties was the improvement of the streams and swamp lands along them; but in the other act the object, as declared, was the building and maintaining of the levees along the Mississippi river, and thereby benefiting the whole district by preventing overflows from that river. But, if the position claimed were maintained, it would not inure to the benefit of complainants, as in such exigency no title has passed to them or the defendant railway company, and the lands are still the property of the state.

Objections are also taken to the time and manner of the sales and conveyances, which need not be considered in detail. A number of these objections would be maintainable but for the effect of the statutes of the state enacted before and since these sales were made, as determined by the supreme court of the state. It must be admitted that there is, at least, a seeming conflict in some of the decisions on these questions; but in the more recent adjudications this real or seeming conflict does not arise or exist. These are entitled to the greater weight; and, being a construction of these statutes by the court of last resort of the state, they are binding upon this court, and especially so when, after careful examination of the purposes of the statute imposing the levee tax, and the condition of the lands and the great conflict of the titles to them, I am satisfied that the recent decisions are sustained by the better reason. Owners of land are vested with certain constitutional rights of which they cannot be deprived by either legislative enactments or judicial decisions, one of which is that they cannot be deprived of their titles to their lands except by due process of law. It was held by this court on the demurrer in this cause that to deprive the owner of land of his title by reason of the non-payment of taxes thereon these things must concur: *First.* There must have been a lawful tax imposed by some body of men, or some one having authority to levy it. *Second.* If the tax was based upon the value of the land, it must have been ascertained by some one authorized by law to assess such value. *Third.* There must have been a default in the payment of the tax within the time prescribed by law. *Fourthly.* There must have been a sale and conveyance made by some one authorized to make the same. These are conditions which the legislature can neither dispense with nor cure by subsequent legislation, nor can the want of them be dispensed with or cured by judicial decision. But, under well-recognized rules, any irregularities in these proceedings,

which the legislature could have authorized to be done in the first instance, may be cured by subsequent legislation, but not so as to destroy vested rights. This rule is so generally acknowledged that reference to authority is unnecessary. For instance, if the sale was made on a day or at a place which the legislature might have authorized, or for delinquent taxes for several years made at one time after default in each year, or other such irregularities, these may be cured by subsequent legislation. This brings us to the consideration of the curative acts, statutes of limitation, or rules of evidence, for they may be considered as possessing one or more or all of these elements which are relied upon by the defendants. The first of these acts was passed on the 10th day of February, 1860, and provides as follows:

"—That all sales of lands hereafter made for non-payment of taxes, due under any law of this state, shall be valid to all intents and purposes,—said lands subject to redemption as provided by law,—and that no such sale shall be impeached or questioned in any manner or for any cause saving fraud or mistake in the assessment, or sale of the same, or upon the proof that the tax for which the same was sold had been paid prior to such sale; and no suit to set aside any title acquired under such sale, hereafter to be made, shall be brought unless within five years from the date of the sale." See Acts 1859–60, p. 216.

The provisions of this act were held by the supreme court of this state in the case of *Belcher* v. *Mhoon*, 47 Miss. 613, to apply to sales for levee taxes; and this ruling stands unreversed. By section 5, Acts 1873, amendatory of the liquidating levee law, it is provided:

"—That upon the expiration of five years from and after the sale of lands for levee taxes under the provisions of said acts no testimony or evidence to impeach or invalidate the deeds therefor * * * shall be entertained by any court of law or equity in this state except in cases of fraud."

And by the fourth section of the same act of power to sell for back taxes or more than one year's taxes is given where the land is delinquent; and all prior sales of this character are validated, whatever might have been the irregularity or informality. Acts 1873, pp. 151–153. The fifth section of the act of 1888 to quiet and settle titles to certain lands in the Yazoo Mississippi delta provides that all sales of lands in the levee district made for the non-payment of levee taxes due thereon shall be and are declared to be valid, and not subject to impeachment for any cause except that the tax for which the land was sold had been paid, and except in cases where the defendant had been in continuous adverse possession of the land, claiming under title or color of title since the date of sale to the levee board, and had continuously paid the taxes thereon, or against any one claiming the land under sales made by the sheriffs under the abatement act of 1878. Acts 1888, p. 42. The proof does not show that any of the lands embraced in this suit are now, or ever have been, in the actual occupancy of either party or any one else, so that the question of actual possession is not involved.

I am of opinion that, under the decisions of the supreme court of the state in the cases of *Nevin* v. *Bailey*, 62 Miss. 436; *Sigman* v. *Lundy*,

v.43f.no.3—13

66 Miss. 529, 6 South. Rep. 245; *Paxton* v. *Land Co.*, 6 South. Rep. 628; and *Metcalfe* v. *Perry*, 66 Miss. 68, 5 South. Rep. 232,—the irregularities in these sales to which objection is taken are cured, and that the complainants are estopped from producing evidence to establish such irregularities so as to defeat defendant's title, and barred from maintaining their suit to recover the lands or to remove defendant's title as a cloud on their title. The constitutional requirements seem to have been complied with. The tax was levied by the legislature at five and three cents per acre upon the land,—not upon the owner,—and no valuation was required. That there was a default in the payment of the tax is admitted, and that neither the original owners of the land, the Selma, Marion & Memphis Railroad Company, nor any person through whom complainants claim title, ever paid one cent of taxes on these lands since 1861 or 1862 is conceded, though, allowing the exemption as claimed, they have been liable to taxation since the 21st of July, 1886. This default has continued for nearly 30 years, so that there is no question as to the delinquency in the payment of the taxes. It is in proof that a sale was in fact made by the sheriffs and tax collectors of most of these lands, and that deeds of conveyance were made by them to the liquidating levee commissioners with a few exceptions. There is no evidence that the complainants or those under whom they claim ever redeemed or offered to redeem these lands from the levee commissioners within the time limited by law. I am of opinion, therefore, that a good and sufficient title to the lands was vested in the levee commissioners, and, if so, no title passed to the state which could have been conveyed to the Selma, Marion & Memphis Railroad Company. The only title the state had before that time acquired to these lands was under sales for the non-payment of taxes, which included the war military tax, and this fact rendered the titles void, as held by repeated decisions of the supreme court of this state. If, therefore, the title was in the levee commissioners, the treasurer and auditor of the state were *ex officio* commissioners and their successors, and the title to these lands was vested in E. C. Gordon under their sale, and the conveyance made and approved by the chancery court of Hinds county in the case of *Green* v. *Gibbs and Hemingway*. They were conveyed by Gordon to B. H. Evers. The lands were sold by McKee, commissioner, under the decree of this court in the suit of *Watson* v. *Evers*, and purchased by Thomas Watson, to whom the commissioner conveyed the title. This sale was confirmed by the decree of the court, and the same lands were sold and conveyed by Watson to the defendants in this cause. The defendants, therefore, have a good title to the lands unless they have been forfeited by reason of the non-payment of the taxes since they were conveyed to Gordon. The proof shows that a forfeiture did take place by reason of the non-payment of the taxes for 1882, and that the lands were sold and conveyed to the state in 1883, and that the state sold and conveyed its title to Stewart as received, who conveyed to Watson under the order and decree of the court. There are no irregularities shown in this sale, and, as the time for redemption had expired before the sale to Stewart as re-

ceiver, and as all the taxes due were paid to the state by Stewart, Watson's title, obtained through this conveyance, was paramount. If a sale, as I believe it was, then it would be independent of all other titles; but, if a redemption, it would remove all incumbrance upon the title derived through the sale and conveyance by McKee, commissioner, and this title was passed to the defendants by Watson's deed to them. This conveyance by the state included any title which was derived at the sale under the abatement act made in 1875. The conveyance by the state to the Selma, Marion & Memphis Railroad Company having occurred before the sale under the abatement act, the title derived under it did not pass by the said conveyance; but, if I am correct in my opinion, that these lands were not exempt from taxation, any title which the company may have had was forfeited by reason of the non-payment of such taxes, and the lands were liable to be sold for non-payment of such taxes.

It may be that a more minute examination of the evidence would develop the fact that a few of the tracts of land described in the pleadings will not be found to belong to either party, as is the case with regard to the lands in Sunflower county, conveyed by S. M. Thompson, which were located with scrip issued to Choctaw county; and other lands in which there is not sufficient evidence of defendant's title, especially certain lands in Bolivar county, unless the title was obtained under the sale of 1875 and the conveyance to J. D. Stewart, the receiver. Such tracts, if they exist, are few in number; and as the lands the title to which is involved in this suit amount to 200,000 acres, and the value in the neighborhood of $1,000,000; and as the title to more than the same number of other acres of equal value, and most of which are now in suit in this court and in the circuit court of the United States in the northern district of this state, depends upon the same law and facts involved in this cause; and ,as I am so strongly impressed with the uncertainty as to whether the Selma, Marion & Memphis Railroad Company had ceased for any purpose to have an existence before the suit of Timpson against the railroad company was instituted; and, if so, that the judgment and all proceedings had in said suit were void, and the complainants are without any title to any of these lands whatever; and also as to the invalidity of the title under the sale made in pursuance of the decree of the United States circuit court for West Tennessee in the cause of Luke P. Blackburn, above referred to,—I deem it best to dismiss complainants' bill to the end that an appeal may be taken at once to the supreme court of the United States, where the errors in the conclusion reached by me will be corrected, and such decision rendered as will finally and conclusively settle the vexed questions of title to this large body of land, which is rapidly increasing in value. In justice to myself, as well as to the learned and distinguished counsel on both sides who have aided me by their diligent research into the facts and law presented in this case, I cannot conclude this opinion without returning my thanks for their able and exhaustive arguments in presenting the questions of law arising on each side. It gives me great pleasure to state

that these arguments have seldom been equaled in any cause heard by me during the many years I have presided in the federal courts of this state.