WOODBURY et al. v. ALLEGHENY & K. R. CO. et al.

(Circuit Court, W. D. Pennsylvania. August 26, 1895.)

No. 33.

1. STATE AND FEDERAL COURTS—JURISDICTION—PENDENCY OF FORMER SUIT.

The A. Ry. Co., a corporation of the states of New York and Pennsylvania, most of whose property lay in the latter state, made a mortgage to the C. Trust Co. to secure an issue of bonds. Pursuant to a provision of

the mortgage, a majority of the bondholders requested the trustee to foreclose the mortgage, and it accordingly commenced suit in a court of the state of New York. The railway company thereupon commenced a suit in the same court, in which it obtained an injunction restraining the trustee from proceeding with the foreclosure. The bondholders then requested the trustee to bring suit for the foreclosure of the mortgage in Pennsylvania, and, upon its refusal to do so, themselves filed a bill in a federal court in Pennsylvania for the foreclosure of the mortgage. *Held*, that the mere pendency of the suit in the New York court in which the trustee had been enjoined from proceeding did not oust the jurisdiction of the federal court to proceed to decree foreclosure of the mortgage on the property in both states.

**2. DEEDS—ALTERATION—RATIFICATION BY GRANTOR.**

The mortgage was made jointly by the railway company and one B., its president, who pledged certain lands owned by him as additional security for the bonds of the railway company. After the directors of the railway company had authorized the execution of the mortgage in such form as should be approved by counsel, to secure the bonds, the mortgage was drawn, executed, and acknowledged by the railway company and B., and submitted to complainants, brokers, who were to purchase a part of the bonds. They objected to the provisions relating to the pledge of B.'s property, requiring that certain reserved interests should be included in the mortgage. After negotiation and correspondence between complainants, B. and his counsel, who was also counsel of the railway company, and W., the secretary of the railway company, a new clause was drawn up by B. and his counsel, including the interests in question, approved by complainants, and then inserted by W., under B.'s direction, in the mortgage, to which W. then obtained the acceptance of the trustee. B. then had the completed mortgage recorded, and, as president of the railway company, executed the bonds reciting the mortgage. Part of the bonds were then delivered to the complainants, who paid cash for them, which was used in paying the indebtedness of the railway company. *Held*, that the bonds were not void or voidable, either by B. or the railway company, on the ground of unauthorized alteration, the change in the mortgage having been fully ratified both by B., whose interest was alone affected, and by the officers of the railway company, who had authority to execute the mortgage in any form approved by counsel.

**3. RAILROAD BONDS—BONA FIDE HOLDER—PENNSYLVANIA CONSTITUTION.**

The mortgage was given in pursuance of a series of contracts between B. and B., the principal stockholders of certain railway companies which were consolidated to form the A. Ry. Co., a firm of brokers, who were to assist in extending the railroad and negotiating the securities of the company, for which they were to receive a part of such securities as commission, and to turn over the proceeds of others to B. and B., and a construction company, which was to build the extensions of the road. Under such contracts, the stock of one of the constituent companies, a New York corporation, was largely increased, and the bonds were to be used in part in retiring the securities of the constituent companies. A large proportion of the bonds issued under the mortgage were sold to the complainants, who paid for them in cash, which was applied to the payment of the debts of the constituent companies, and who had no knowledge of the contracts leading up to the making of the mortgage and the issue of the bonds. *Held* that, without regard to such previous contracts, the bonds bought and paid for by the complainants were not within the prohibition of the constitution of Pennsylvania that no corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; the validity of the bonds could not be questioned, and the complainants were entitled to a foreclosure of the mortgage.

**4. MORTGAGES—PENNSYLVANIA STAY LAWS.**

The stay clause in the Pennsylvania statute of 1705 (1 Smith's Laws, p. 60) applies only to scire facias sur mortgage, and not to a bill in equity to foreclose.

C. Walter Artz, for complainants.

Jack & Roberts and A. Moot, for defendants.

Before ACHESON, Circuit Judge, and BUFFINGTON, District Judge.

BUFFINGTON, District Judge. This bill in equity was filed August 23, 1892, by Woodbury & Moulton, a firm whose members are citizens and residents of the state of Maine, against the Allegheny & Kinzua Railroad Company, a consolidated corporation of the states of Pennsylvania and New York, Spencer S. Bullis and Sarah E., his wife, the Central Trust Company, a corporation of the state of New York, and others, to foreclose a joint mortgage given by the said railroad and Bullis to the said trust company. The mortgage is dated February 1, 1890, is recorded March 10, 1890, in McKean county, Pa., and in Cattaraugus county, N. Y., and is to secure payment of $500,000 of the bonds of said railroad. Of the bonds, $200,000 are in the trustee's hands, unissued. Of the $300,000 issued, $15,000 were paid under a sinking-fund provision, leaving $285,000 outstanding. Default was made of the semiannual interest due February 1, 1892, and on the principal of $15,000 of bonds then payable under the sinking-fund clause. Pending such default, the trustee (upon the written request of more than 50 per cent. of the bondholders to so declare and to foreclose), in pursuance of the provisions of the mortgage, declared the entire outstanding issue of bonds due. In pursuance of the above request of the bondholders the Central Trust Company, the trustee, in April, 1892, began an action to foreclose in the supreme court of the state of New York, Cattaraugus county. Thereupon the railroad company filed a bill in said court against the trustee and others, in which, on July 26, 1892, that court, by an order which is still in force, enjoined the trustee from proceeding in said action. On August 17, 1892, the present complainants, the owners of $50,000 of said outstanding bonds, and who had joined in the previous noted request to the trustee, requested the trustee, among other things, to bring an action to foreclose in Pennsylvania, where most of the mortgaged property was situate. This the trustee declined to do, on account of the pending order above recited; whereupon the complainants filed the present bill to foreclose on behalf of themselves and other bondholders. To it the trustee has made no defense or objection. On October 5, 1892, the railroad company and Bullis filed separate demurrers, alleging the bill contained no averment that "a written request of the holders of a majority in amount at par value of the outstanding and unpaid bonds issued under the mortgage sought to be foreclosed by said bill, accompanied by proper bonds of indemnification, was made to the trustee under said mortgage, requesting the commencement of this suit by it." They also filed special pleas to the effect that the trustee had, before the bringing of this suit, brought a bill to foreclose the same mortgage in the supreme court of New York, Cattaraugus county, which suit was pending

and undetermined. These pleas and demurrers were, on February 6, 1893, overruled. The same questions being raised on final hearing, we have re-examined them, and find no reason to change the views then held. Article 6 of the mortgage provides that the trustee "shall, upon the written request of the holders of a majority in amount at par value of the outstanding and unpaid bonds which may have been issued hereunder, and upon being properly indemnified, and whenever entitled to do so by the terms hereof, institute proceedings to foreclose this mortgage, whenever the holders of a majority in value of said outstanding and unpaid bonds may direct; and, in absence of any such direction, then as the trustee may deem expedient." This the bill (paragraph 11) expressly alleges was done, viz.: "Said trust company was duly requested in writing by the holders of more than 50 per centum of the said bonds outstanding to exercise its option, and to declare that the principal of all the bonds secured by said mortgage or deed of trust should become immediately due and payable, anything contained in the said bonds to the contrary notwithstanding, and to foreclose said mortgage or deed of trust;" and we find such demand was made before the New York suit was begun. The bill also avers, and the proofs show, an additional notice and request by the complainants to the trustee before this bill was filed. By this precedent request the trustee was called upon to execute the trusts imposed by the mortgage upon it for the bondholders. Ashhurst v. Iron Co., 35 Pa. St. 30; Bradley v. Railroad Co., 36 Pa. St. 152; Com. v. Susquehanna & D. R. R. Co., 122 Pa. St. 306, 15 Atl. 448. Indemnification was a right personal to the trustee, which it could, and presumably did, waive; for it has not raised any such question, or, indeed, any objection to the present bill. The property and line of the respondent railroad being situate in two states, and the road a consolidated one under the laws of both, the courts of each state had jurisdiction to foreclose and sell the entire line. Muller v. Dows, 94 U. S. 444; McElrath v. Railroad Co., 55 Pa. St. 208. See, also, Massie v. Watts, 6 Cranch, 148, and Burnley v. Stevenson, 24 Ohio St. 474. That the mere filing of a bill to foreclose in the New York state court did not oust the jurisdiction of the circuit court for the Western district of Pennsylvania is clear. Stanton v. Embrey, 93 U. S. 548; Gordon v. Gilfoil, 99 U. S. 168. While the New York court enjoined the trustee from bringing all suits upon the matters involved in the suit before it, and the trustee prudently obeyed the order, yet the mere pendency of that suit, or the subsequent restraining order upon the trustee, did not, in the absence of a final decree by that court, oust the jurisdiction of the United States circuit court of the Western district of Pennsylvania, or prevent it from entertaining a suit and determining all questions properly brought before it, although the same questions might be involved in the suit pending and undetermined in the first-named court. The right and duty to foreclose having been settled by the proper number of bondholders, and the hands of the

trustee having been tied in an attempt to foreclose, are the cestuis que trustent thereby deprived of their right to prosecute their foreclosure in the circuit court of the United States in another state, and one where the bulk of the property mortgaged lies?  Assuredly not, and the wisdom of the rule is apparent from this case. The railroad company, having obtained the restraining order in July, 1892, in the court first appealed to, has not taken a single step towards obtaining a final decree in that case, and yet, in the absence of such a decree, or of any attempt to secure one, now suggests that the federal court, in which a vast amount of proofs have been taken, and a huge record presented for final decree, is powerless to afford complainants relief because of the mere pendency of the other bill.  We are of opinion the circuit court originally had jurisdiction of the subject-matter of their present bill; that its jurisdiction was not ousted by the filing of a bill in the New York state court; and that under the facts peculiar to this case the complainants had the right to file this bill, and, having filed it, and all parties in interest having appeared and taken part in the case, including the railroad company, Mr. Bullis, and the trustee, our jurisdiction to foreclose the mortgage upon all the property included therein, as well that within the state of New York as that within the state of Pennsylvania, seems to us to be clear.  Muller v. Dows, 94 U. S. 444; Massie v. Watts, 6 Cranch, 148; Bradley v. Railroad Co., 36 Pa. St. 141; Burnley v. Stevenson, 24 Ohio St. 474; McElrath v. Railroad Co., 55 Pa. St. 208.

The validity of the mortgage, however, is assailed on the ground of an unauthorized alteration.  The bonds were given by the railroad company alone.  The mortgage was a joint one, in which the company mortgaged its property and franchises; and Spencer S. Bullis, who was its president, one of its large stockholders, and the owner of large bodies of timber land along its line in Pennsylvania and New York, mortgaged these lands as additional security for the company's bonds.  At a meeting of the directors of the railroad held February 1, 1890, a resolution was passed, which, after reciting that Bullis was to join in the mortgage, provided that "the officers of this company are hereby authorized and directed to make, execute, and deliver said mortgage or deed of trust in such form as they may be advised by counsel, and to make, execute, and deliver under the terms thereof the bonds of said company to the number and in the amount hereinafter specified, substantially in the following form; that is to say" (then follows a copy of the bond).  It would seem from the recitals in the resolution that both bonds and mortgage had been previously drawn, and it would appear the board adopted the specific form of bond, but made the form of mortgage subject to advice of counsel. While this term is general, yet, under the proofs, Frank Sullivan Smith, Esq., who was counsel for Bullis, the company, and for Newcombe & Co., the negotiating brokers, was evidently the person contemplated.  The mortgage, as originally prepared, was duly signed for the company by Mr. Bullis, its president, attested

by Lewis F. Wilson, its secretary, and its execution acknowledged and proved by them, February 27, 1890. On the same day it was executed by Bullis as an individual, his wife joining, and duly acknowledged by them. As thus executed, the mortgage provided for the reservation in Bullis of the timber, wood, lumber, and bark; also for the petroleum, gas, coal, and other minerals of the lands mortgaged. It was submitted to complainants, a firm of brokers at Portland, Me., who had been in communication for some time with the parties with a view of purchasing $125,000 of the bonds. They objected to it by telegram to Mr. Smith, and claimed there should be a forfeiture of Bullis' reserved rights to the timber in case of default. This message was forwarded to Bullis, with a note calling attention to the fact that complainants asked "that a provision be inserted in the mortgage that, in case of a default in the payment of the interest on the bonds, upon a foreclosure of the mortgage the timber land can be sold free of the reservation to you." To this Bullis replied by letter, in which he said: "I could not, perhaps, make a change in that mortgage that would meet the point they make, inasmuch as in some cases I do not own the reservations. Whatever the mortgage covers, I, of course, expect will be subject to sale upon any default, the same as any other part of the property." On March 4th, Mr. York, a member of complainants' firm, met Mr. Bullis in New York. He says he told the latter that the absence of the default clause was an insurmountable objection. After a conference a clause meeting York's objection was drawn by Wilson, Smith's clerk, and the secretary of the railroad, but he would not take the responsibility of inserting it in the mortgage without the consent of Smith. The latter was at Olean, N. Y., and it was arranged Bullis should take the proposed clause to him there, and submit it to him. He did so, and Smith prepared another form of it, which was afterwards inserted, and in which not only was the reserved timber which Bullis owned made subject to sale on default, but his contracts for timber also. He then sent a copy of this in a letter to Woodbury & Moulton, in which he said, "In this I have conceded everything that you ask." The testimony is that York did not know the mortgage had already been acknowledged, and Mr. Bullis further added in his letter: "Will you please examine it, and, if satisfactory, wire him [Smith] to New York, and the mortgage will then be executed in this form." He also sent a copy in a letter to Wilson, telling him he had sent a copy to Portland, and saying, "It will, of course, be satisfactory, as it is all they ask." The following day he wrote Wilson, as secretary of the road, signing himself as president, and saying, "Let me know if we must execute it here again, or whether the pages are so arranged that no further execution will be necessary." Woodbury & Moulton having reported the clause satisfactory, Wilson, in pursuance of an arrangement made with Bullis, had the new clause printed, and inserted in the mortgage. He then had the trust company accept the trust, which it had not before done, and forwarded the com-

pleted mortgage to Bullis for record. This Bullis did, then came to New York, and, as president of the railroad, executed the bonds, which recited they were "secured by a first mortgage or deed of trust bearing even date herewith, duly executed by said railroad company to the Central Trust Company of New York." Thereafter $125,000 of them were delivered to complainants, for which they paid par in cash. Of the sum received from them by the trust company $110,000 was applied, as provided in the sixth provision of the mortgage, to the payment of prior bonded indebtedness of the Bradford & Corydon Railroad, a Pennsylvania corporation, one of the constituent companies of the respondent railroad, and whose debts it had assumed. The balance was applied to other indebtedness of the constituent companies.

In view of these facts we fail to see how either Bullis or the railroad can, on the ground of an unauthorized alteration, successfully attack this mortgage. The subject-matter of the reservation concerned Bullis alone. He was a surety for the debt of the company, and the extent of the pledge he gave the mortgagee was a question solely between him and it. The inserted clause neither diminished, increased, nor affected the debt in bonds which the railroad incurred. There can be no doubt that, so far as Bullis personally was concerned, the clause was fully understood by him, was inserted with his consent, and was ratified by his placing it of record. Under these facts he is not in position to take advantage of the absence of a reacknowledgment, and this especially in view of the fact that in his letter to complainants he promised, if the clause were satisfactory, "the mortgage will then be executed in this form." Nor, if it be granted the clause affected the railroad, can it defeat the mortgage on this ground. As finally put on record, the instrument was one which the executive officers could, under the resolution, have made and executed. If they had the right to execute in that form, manifestly they had a right to waive a re-execution of it when changed to that form. The change was approved by Smith, its counsel, ratified, and accepted by its president and secretary, the only officers required to execute it, and was by them placed of record. Subsequently the bonds were executed, negotiated, and their full value applied by the trustee, the agent of the railroad, to the payment of uncontested debts. Under any view, the mortgage cannot be declared void or voidable on the ground of alteration.

But its validity is attacked for the reason that it is alleged to be part of a scheme to issue bonds and stocks in contravention to that provision of the constitution of Pennsylvania which provides: "No corporation shall issue stocks or bonds, except for money, labor done or money or property actually received; and all fictitious increase of stock or indebtedness shall be void." This question renders necessary a summary of the somewhat complicated proceedings and agreements out of which these bonds arose. The Allegheny & Kinzua Railroad Company, the respondent mortgagor, is a consolidated corporation of New York and Pennsylvania, and was formed by merger

of the Allegheny & Kinzua Railroad Company of New York, the Allegheny & Kinzua Railroad Company of Pennsylvania, and the Bradford & Corydon Railroad Company of Pennsylvania. On October 8, 1889, Messrs. Bullis and Barse, of Olean, N. Y., who were the principal stockholders of the two constituent Pennsylvania companies, entered into an agreement with the broker firm of I. B. Newcombe & Co., of New York City, with a view to their consolidation and extension. The contract recites the two companies have a mileage of 16 miles, which it is proposed to extend to 30; that Bullis and Barse are the owners of or control 30,000 acres of valuable timber lands tributary to the roads, the product of which they desire to carry over the completed roads, and that they have applied for financial aid to Newcombe & Co. On their part, Bullis and Barse agreed to cause the roads and the 30,000 acres of land to be owned or controlled by a corporation of Pennsylvania with a capital of $250,000, and to cause a mortgage to be given to secure $250,000 bonds to be issued by said to be formed company. Newcombe & Co. agreed to negotiate $210,000 of the bonds at par, and turn over the proceeds to Bullis and Barse. One hundred and twenty-five thousand of these they were not required to negotiate, except as the contemplated 14 miles of the road were completed in 5-mile sections under the directions of John Byrne, a civil engineer, connected with their house. On completion of such 5-mile sections Bullis and Barse were to receive the proceeds of five-fourteenths of the $135,000. Seventy-five thousand were to be negotiated presently; and concurrently with their sale Newcombe & Co. were to receive the remaining $40,000 of the issue for their commissions, labor, and services, of which bonds Byrne, the engineer, was to have $15,000 for services performed or to be performed. It was agreed that 1,000 acres of timber land per mile or completed road—in all 16,000 acres for 16 miles—were to be under the lien of the mortgage originally; and that for every 5-mile section of the road subsequently completed for which Newcombe & Co. were required to sell bonds, 5,000 additional acres should be placed under the lien of said mortgage. Of the $250,000 stock Bullis and Barse were to give Newcombe & Co. $100,000, of which Byrne was to have $15,000; and they were to guaranty for two years a 6 per cent. dividend on $40,000. This agreement was subsequently modified by one of December 9th following, which recites that Bullis and Barse were owners of this stock of the Allegheny & Kinzua Railroad Company of New York, a line of which 10 miles were completed out of a contemplated 16; that it was desired to consolidate it with the two Pennsylvania corporations, and form a new consolidated one. By it Bullis and Barse agreed to procure such merger into a corporation with $500,000 capital, and to issue $500,000 bonds, secured by a first mortgage upon the property of the merged roads, "including 30,000 acres of timber land for the first 46 miles of railroad constructed and completed, and 16,000 acres for the additional 24 miles to be constructed and completed as aforesaid." Newcombe & Co. agreed on their part to negotiate $260,000 of the bonds at par, and turn over the proceeds to Bullis and Barse. One hundred and thirty-five thousand of them they were not

required to negotiate, except as the contemplated 16 miles of the road were completed in 5-mile sections, as in the original contract; and on completion of such sections Bullis and Barse were to receive the proceeds of five-sixteenths of the bonds. Of the remaining bonds $125,000 were to be negotiated at once (provided 26,000 acres of timber land was placed under the mortgage), and concurrently with their negotiation Newcombe & Co. were to receive the commissions before mentioned, viz. $40,000 in bonds and $100,000 in stock. The remaining $200,000 in bonds and the like amount of stock were reserved to provide for the building of the 24 miles of additional road. It was agreed Bullis and Barse might contract with the Interior Construction & Improvement Company of New Jersey to perform their covenants under these contracts. On the same day the construction company mentioned, of which John Byrne was president and principal stockholder, entered into an agreement with the Allegheny & Kinzua Railroad Company of New York to construct its road to the Pennsylvania state line, to acquire the two Pennsylvania companies by merger or consolidation, and construct and complete the consolidated road under directions of the railroad company's engineer up to 46 miles, and, if required, to construct the remaining 24 miles, so that the consolidated company should have 70 miles of completed road at a cost not to exceed $7,000 per mile. It further agreed to pay all liens, etc., of the constituent roads, and furnish certain rolling stock. The railroad agreed to increase its capital stock from $80,000 to $390,000, to issue $500,000 bonds secured by mortgage on its property, and that it would pay all of said bonds and stocks to the construction company for its work as above, performed or to be performed, as soon as they could be legally issued. It was further provided the consolidated company to be formed should have a capital stock of $500,000 (made up of the stock of the New York company, $390,000, and the Pennsylvania companies, $110,000), and that it should issue $500,000 in bonds, secured by mortgage on its property, and certain lands in addition, for the purpose of retiring the New York company's bonds, specified above, which bonds, as well as the stock of said company, the construction company had a right to exchange for corresponding bonds and stocks of the consolidated company. On the same day the construction company entered into an agreement with Bullis and Barse in which the foregoing contract was recited and made part thereof. By it the construction company agreed to make the following disposition of the stock and bonds of the consolidated company received by it under the preceding contract: To Newcombe & Co., $260,000 bonds, to be sold under agreements of October 8, 1889, and December 9, 1889. To Newcombe & Co., $40,000 bonds, commissions under said agreements. To Central Trust Company, $200,000 bonds, to provide for construction of 24 additional miles of road. To Bullis and Barse, $265,000 stock. To Newcombe & Co., $100,000 stock, for commissions under first agreements. To construction company, $135,000 stock, for its compensation. Bullis and Barse, on their part, agreed to apply the proceeds of bonds sold by Newcombe & Co. to payment of liens upon property covered by mortgage, to carry out the consolida-

tion, to provide for construction of the additional road to be built under the preceding agreement, to cause the proper amount of timber land to be placed under the mortgage, and save the construction company harmless. The same day the Allegheny & Kinzua Railroad of New York executed the mortgage to secure the $500,000 bonds provided for in the preceding agreement. In pursuance of the agreements the stockholders of the latter corporation voted to increase its capital stock to $390,000, and applied to the board of railroad commissioners of New York state to sanction their action. On February 24, 1890, that board approved the proposed increase, and an examination of its order shows the contract of the railroad with the construction company, the proposed issue of bonds, the payment of bonds and stocks to the construction company, and the terms of merger with the Pennsylvania companies were all fully set forth and understood by that body. Thereafter the constituent roads were merged and consolidated, the subsisting debts and contracts thereof assumed by the consolidated company, and the mortgage in suit given. Of the $300,000 of bonds issued thereunder, $125,000, as we have seen, went to Woodbury & Moulton, the complainants; $40,000 to Newcombe & Co. for commissions, of which sum Byrne was to get $15,000; and $135,000 are alleged to have been sold, and their proceeds spent in construction. Of the fact that this latter sum was properly expended in behalf of the railroad there is a dispute. Of the Woodbury & Moulton bonds $15,000 were retired under the sinking-fund clause of the mortgage.

Whatever contention may be made in reference to the preceding agreements, and to the increase of stocks and issues of bonds in pursuance thereof, it is certain that of the validity of the bonds bought and paid for by the complainants there can be no question. Mr. York, one of the firm, testifies he knew nothing of the previous contracts. It is true, Mr. Woodbury, the other member, was named as a director of the consolidated company, but there is no evidence that he took part in or knew of any of the contracts or proceedings leading to said issues. That complainants received at the time of the purchase of the bonds, as a bonus or inducement to do so, a portion of stock of the consolidated company from Newcombe & Co., the negotiating brokers, does not affect them in any way. They paid full value for their bonds to the trustee, and the money was applied to the payment of the debts of the constituent companies, the validity and legality of which debts are in no wise questioned. These bonds are, therefore, not within the constitutional prohibition that "no corporation shall issue stocks or bonds except for money, labor done, or money or property actually received." Having issued them for a lawful purpose, having negotiated them for full value, and having used their proceeds for the payment of its legal obligations, they were not such bonds as the constitution inhibited, and the consolidated company must pay them. The bonds of complainants being valid, and being secured by the mortgage in suit, why should it not be foreclosed? That disputes may exist between

the railroad company, the construction company, and Messrs. Bullis & Barse as to the extent, expense, and details of construction; that questions exist as to the proper application of the proceeds of some of the other bonds; or that their holders are not purchasers for value; or that there is stock outstanding whose legality is questioned,—are questions which do not affect the right of the complainants, who are bona fide holders for value, to have their security enforced by foreclosure.

The view we take of this case renders it needless to discuss the many other questions suggested. It is, however, alleged that, even if a right to foreclose exists, the bill is prematurely filed, by reason of the year and a day stay clause of the Pennsylvania state statute of 1705 (1 Smith's Laws, p. 60). We cannot accede to this view. That act applies to a scire facias sur mortgage, and has no application to a bill in equity to foreclose such as the present.

It is also contended the lien of the mortgage was not to cover Mr. Bullis' timber land until 46 miles of road were constructed. Assuming, for present purposes, the 46 miles were not built, the position contended for cannot be yielded. While there is some ambiguity in the description of the lien of the mortgage as given in the bonds, viz.: "This bond * * * is * * * secured by * * * mortgage * * * upon the property and franchises of said railroad company, including thirty thousand acres of timber land, upon the construction and completion of the first forty-six miles of the railroad of said railroad company,"—yet all uncertainty disappears when we turn to the mortgage itself. It contains words of present conveyance, describes lands by metes and bounds, in its seventh clause provides for the further conveyance of the 16,000 acres mentioned in the bond, "in addition to the thirty thousand acres of timber land conveyed to said trustee by this mortgage." If further reason were needed in support of this view it would be found in the third clause of the agreement of Bullis & Barse with Newcombe & Co., of December 9, 1889, that the latter were not required to negotiate the $125,000 lot of bonds until the contemplated mortgage "shall constitute a security upon twenty-six thousand acres of land" and in article 10 of the mortgage, where careful provision was made to enable the trustee to release portions of the timber land from its lien,—a provision subsequently acted upon by Mr. Bullis, and money actually paid for such release. We see no reason to depart from the express words of present conveyance of the land in the mortgage, and the presumption of law is that all previous verbal negotiations and understandings were merged in the final writing. On the whole, we are of opinion a right to foreclose has been shown.