## MULLER *v.* DOWS.

1. A suit by or against a corporation in a court of the United States is regarded as brought by or against its stockholders, all of whom are, for the purposes of jurisdiction, conclusively presumed to be citizens of the State which created it.

2. It should appear by the declaration, or bill of complaint, that the corporation was created by the State whereof the adverse party is not a citizen; but a defective averment of that fact may be cured by the subsequent pleadings.

3. A corporation created by the laws of Iowa, although consolidated with another of the same name in Missouri, under the authority of a statute of each State, is, nevertheless, in Iowa, a corporation existing there under the laws of that State alone.

4. A decree, foreclosing a mortgage executed by the Chicago and South-western Railroad Company of its entire railroad and franchises, and ordering a sale of them, passed by the Circuit Court of the United States for the District of Iowa, which, in a suit there pending, had jurisdiction of the mortgagor and the trustees in the mortgage, is not invalid because a part of the property ordered to be sold is situate in the State of Missouri.

5. The court holds that there was no waiver by the Chicago, Rock Island, and Pacific Railroad Company of its right to foreclose the mortgage.

6. A surety, who holds several securities by way of indemnity, may resort to either of them for payment.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

*Mr. Charles M. Da Costa* for the appellants.

*Mr. Thomas F. Withrow, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

The decree made below is assailed here for several reasons. The first is, that the court had no jurisdiction of the suit, in consequence of the want of proper and necessary citizenship of the parties. This objection was not taken in the Circuit Court, but it is of such a nature, that, if well founded, it must be re-garded as fatal to the decree. The bill avers that Dows and Winston, two of the complainants, are citizens and residents of the State of New York, and that Burnes, the other complainant, is a citizen and resident of the State of Missouri. The two original defendants, the Chicago and South-western Railway Company, and the Chicago, Rock Island, and Pacific Railroad Company, are averred to be citizens of the State of Iowa. Were this all that the pleadings exhibit of the citizenship of the parties, it would not be enough to give the Circuit Court jurisdiction of the case. In *The Lafayette Insurance Company* v. *French et al.*, 18 How. 404, a similar averment was held to be insufficient, because it did not appear from it that the Lafayette Insurance Company was a corporation; or, if it was, that it did not appear by the law of what State it was made a corpora-tion. It was therefore ruled, that, if the defective averment had not been otherwise supplied, the suit must have been dis-missed. A corporation itself can be a citizen of no State in the sense in which the word " citizen " is used in the Constitution of the United States. A suit may be brought in the Federal courts by or against a corporation, but in such a case it is regarded as a suit brought by or against the stockholders of the corporation; and, for the purposes of jurisdiction, it is conclusively presumed that all the stockholders are citizens of the State which, by its laws, created the corporation. It is, therefore, necessary that it be made to appear that the artificial being was brought into existence by the law of some State other than that of which the adverse party is a citizen. Such an averment is usually made in the introduction, or in the stating part of the bill. It is always there made, if the bill is formally drafted. But if made anywhere in the pleadings, it is sufficient. In *The Lafayette Insurance Company* v. *French et al., supra,* the defective aver-ment of citizenship was held to have been supplied by the plain-tiff's replication to the plea, which alleged that the defendants

were a corporation created under the laws of Indiana, having its principal place of business in that State. And, in the present case, we think the averment in the introduction of the bill, that the two defendant corporations were citizens of Iowa, which, if standing alone, would be insufficient to show jurisdiction in the Federal court, has been supplemented by other averments which satisfactorily show that the court had jurisdiction of the case. The bill in its stating part alleges that the Chicago and South-western Railway Company, of the State of Iowa, was organized by the adoption of articles of association in the manner provided by the laws of said State, and that, with all the powers, rights, and privileges granted and conferred on corporations by the then existing laws of the said State, it assumed to act. The articles of association are appended to the bill as an exhibit, and made part of it by proper reference. So are the articles of consolidation with a corporation of the same name of Missouri, in which the Chicago and South-western Railway Company in Iowa is recited to be a body politic and corporate, organized and existing under and by virtue of the laws of the State of Iowa. The averments of the bill were generally admitted in the answers of both the defendant companies. But this is not all. Throughout the pleadings, the corporate existence under the laws of Iowa of both the companies is either admitted or asserted by all the original parties, and by the appellants, who were made parties after the suit had been some time in progress. The petition of the appellants to be made parties adopted another petition, in which it was alleged that the Chicago, Rock Island, and Pacific Railroad Company was and is a corporation organized under and in pursuance of the laws of the States of Illinois and Iowa, and that the Chicago and South-western Railway Company was and is a corporation created under and by virtue of the laws of the States of Missouri and Iowa. Having been made parties, the appellants filed cross-bills against the present complainants and the two companies, in which they repeated the averments they had previously adopted ; and the answer to the cross-bill made by all the defendants therein expressly admitted them. The record is thus seen to be full of showing that both the defendant corporations derived their existence as corporate bodies under the laws of Iowa, at least in part, and that they were corporations of that State.

Still, it is argued on behalf of the appellants that the Chicago and South-western Railway Company cannot claim to be a corporation created by the laws of Iowa, because it was formed by a consolidation of the Iowa company with another of the same name, chartered by the laws of Missouri, the consolidation having been allowed by the statutes of each State. Hence, it is argued the corporation was created by the laws of Iowa and of Missouri; and as Burnes, one of the plaintiffs, is a citizen of Missouri, it is inferred that the Circuit Court had no jurisdiction. We cannot assent to this inference. It is true the provisions of the statutes of Iowa, respecting railroad consolidation of roads within the State with others outside of the State, were that any railroad company, organized under the laws of the State, or that might thus be organized, should have power to intersect, join, and unite their railroads constructed or to be constructed in the State, or in any adjoining State, at such point on the State line, or at any other point, as might be mutually agreed upon by said companies; and such railroads were authorized to " merge and consolidate the stock of the respective companies, making one joint-stock company of the railroads thus connected." The Missouri statutes contained similar provisions; and with these laws in force the consolidation of the Chicago and South-western railways was effected. The two companies became one. But in the State of Iowa that one was an Iowa corporation, existing under the laws of that State alone. The laws of Missouri had no operation in Iowa. It is, however, unnecessary to discuss this subject further. Doubt in regard to it is put at rest by the decision of this court in *Railway Company* v. *Whitton's Administrator*, 13 Wall. 270. There a similar question arose. A suit was brought by a citizen of Illinois in the State of Wisconsin, and it became a question whether the Federal Circuit Court of the latter State could entertain jurisdiction. The company, sued at first in the State court, resisted an application to remove the case into the United States Circuit Court, on affidavits that it was a corporation created by and existing under the laws of the States of Illinois, Wisconsin, and Michigan; that its line of railway was located, in part, in each of these States; that its entire line of railway was managed and controlled by the defendant as a single cor-

poration ; that all its powers and franchises were exercised, and its affairs managed and controlled, by one board of directors and officers ; that its principal office and place of business was at the city of Chicago, in the State of Illinois, and that there was no office for the control or management of the general business and affairs of the corporation in Wisconsin. Nevertheless, the Circuit Court took jurisdiction of the case ; and this court held correctly, remarking that " the defendant is a corporation, and as such a citizen of Wisconsin by the laws of that State. It is not there a corporation or citizen of any other State. Being there sued, it can only be brought into court as a citizen of that State, whatever its *status* or citizenship may be elsewhere." In view of this decision, it must be held that the objection to the jurisdiction of the Circuit Court of Iowa is unsustainable.

The next objection urged against the decree of the court below is, that it is void so far as it directed the usual foreclosure and sale of property not within the territorial jurisdiction of the court. A part of the Chicago and South-western Railway is in the State of Missouri, and the mortgage which the bill sought to have foreclosed covered that part, as well as the part in the State of Iowa. The court decreed a sale of the entire property covered by the mortgage, and directed the master, who was ordered to make the sale, to execute a good and sufficient deed or deeds to the purchaser. It also declared that after the sale both the defendant corporations and the complainants' trustees named in the mortgage, as well as all persons claiming under them or either of them, be barred and foreclosed from all interest, estate, right, claim, or equity of redemption of, in, and to the property, reserving, however, the rights of the holders of the bonds and coupons secured by the first mortgage, then remaining outstanding and unpaid. It directed that the two defendant corporations should surrender to the purchaser the property sold and conveyed, upon the execution, approval, and delivery of the master's deed ; and that, as further assurance, the Chicago and South-western Railway Company should, on the approval and delivery of the master's deed, convey all the property therein described to the purchaser, by their good and sufficient deed.

If such a foreclosure and sale cannot be made of a railroad which crosses a State line and is within two States, when the entire line is subject to one mortgage, it is certainly to be regretted, and to hold that it cannot be would be disastrous, not only to the companies that own the road, but to the holders of bonds secured by the mortgage. Multitudes of bridges span navigable streams in the United States, streams that are boundaries of two States. These bridges are often mortgaged. Can it be that they cannot be sold as entireties by the decree of a court which has jurisdiction of the mortgagors? A vast number of railroads, partly in one State and partly in an adjoining State, forming continuous lines, have been constructed by consolidated companies, and mortgaged as entireties. It would be safe to say that more than one hundred millions of dollars have been invested on the faith of such mortgages. In many cases these investments are sufficiently insecure at the best. But if the railroad, under legal process, can be sold only in fragments; if, as in this case, where the mortgage is upon the whole line, and includes the franchises of the corporation which made the mortgage, the decree of foreclosure and sale can reach only the part of the road which is within the State, — it is plain that the property must be comparatively worthless at the sale. A part of a railroad may be of little value when its ownership is severed from the ownership of another part. And the franchise of the company is not capable of division. In view of this, before we can set aside the decree which was made, it ought to be made clearly to appear beyond the power of the court. Without reference to the English chancery decisions, where this objection to the decree would be quite untenable, we think the power of courts of chancery in this country is sufficient to authorize such a decree as was here made. It is here undoubtedly a recognized doctrine that a court of equity, sitting in a State and having jurisdiction of the person, may decree a conveyance by him of land in another State, and may enforce the decree by process against the defendant. True, it cannot send its process into that other State, nor can it deliver possession of land in another jurisdiction, but it can command and enforce a transfer of the title. And there seems to be no reason why it cannot, in a proper case, effect the transfer by

the agency of the trustees when they are complainants. In *McElrath* v. *The Pittsburg & Steubenville Railroad Co.*, 55 Penn. St. 189, — a bill for foreclosure of a mortgage, — in which it appeared that a railroad company, whose road was partly in Pennsylvania and partly in West Virginia, had mortgaged all their rights in the whole road, the court decreed that the trustee who had brought the suit, being within its jurisdiction, should sell and convey all the mortgaged property, as well that in the State of West Virginia as that in Pennsylvania. This case is directly in point, and tends to justify the decree made in the present case. The mortgagors here were within the jurisdiction of the court. So were the trustees of the mortgage. It was at the instance of the latter the master was ordered to make the sale. The court might have ordered the trustees to make it. The mortgagors who were foreclosed were enjoined against claiming property after the master's sale, and directed to make a deed to the purchaser in further assurance. And the court can direct the trustees to make a. deed to the purchaser in confirmation of the sale. We cannot, therefore, declare void the decree which was made.

The next objection urged by the appellants is, that the bill for a foreclosure and all the proceedings therein were collusive. It is said the suit was instituted by collusion between the trustees and the Rock Island and South-western Railroad Companies, for the purpose of destroying the lien of the Atchinson branch bondholders on the main line of the South-western Railway, and to enable the Rock Island company to obtain the title to the main line, discharged from any lien or claim on the part of such bondholders. After careful examination of the evidence, we have failed to find any thing that justifies this objection. And certainly, if there was collusion in bringing and conducting the suit, the appellants have not been injured by it. They were permitted to come in as parties defendant, and they had full opportunity to assert their equities.

The fourth objection is general. It is, that, at the time of filing the bill, no right of foreclosure existed in favor of the complainant trustees for the benefit of the Chicago and Rock Island Railway Company, or, if such a right did exist, that it had been waived. In respect to this objection we have to

remark, that unless the right to a foreclosure had been waived by the Rock Island company, we discover no foundation for the assertion that there was no right of foreclosure when the suit was brought. That company had indorsed $5,000,000 of the bonds of the South-western company secured by the mortgage; and, in consequence of the indorsement, had paid coupons for interest of the bonds to a large amount. The mortgage stipulated that it might be foreclosed, in case of failure by the mortgagor to pay the interest; and it stipulated further, that in case the Rock Island company should, in consequence of its guaranty, pay any of the bonds or coupons, the mortgage might be foreclosed at their instance. The right to foreclose at the instance of the Rock Island company was expressly given. Was there any waiver of this right? We think not. It is said that the contract of July 27, 1871, coupled with the contract of Oct. 1, 1869, constituted a waiver. The contract first made preceded and contemplated the execution of the mortgage. It gave to the Rock Island company the option of furnishing the equipment for the South-western road, or to lease and operate it on such terms as might be agreed upon. Manifestly, this was for an additional security to the guarantors of the bonds, and not for a substituted security. And the contract of July 27, 1871, made between the Rock Island company and the South-western, merely provided that, with regard to the lease of the branch railroad proposed to be constructed by the latter to the Missouri River, opposite Atchinson, it should be used and operated by the Rock Island road in the same manner and on the same terms as the main line of the South-western. The meaning of this is, not that a lease existed, or should be taken, though one may have been contemplated, but that the branch road should be operated in the same manner and on the same terms as the main line might be. How this contract alone, or connected with the contract of Oct. 1, 1869, can be construed as a waiver of a right to sue for foreclosure of the mortgage on the main line, we are unable to comprehend. Nor can we see that the contract of Dec. 4, 1871, called a "lease contract," even if it be regarded as an executed and subsisting contract, can have such an effect. We have heretofore said that the agreement to give and take a lease, dependent on the option of the Rock

Island company, was intended as an additional security to that company for its indorsement of the bonds. If we are correct, a lease executed in pursuance of the agreement could be only cumulative security. Hence, it could be no waiver of the right to foreclose.

But, in fact, there was no lease, nor any agreement for a lease, that could be enforced specifically. The language of the agreement of Oct. 1, 1869, and that of the agreement of July 27, 1871, warrant no interpretation that makes them a lease in law, or in equity. The first, it is true, contemplated the possibility of a lease of the main line, if the terms could be agreed upon; and the latter provided that when such lease should be agreed upon, if ever, it should also embrace the branch line. But the terms never were agreed upon. On the thirtieth day of October, 1871, at a meeting of the executive committee of the Rock Island company, Messrs. Scott and Riddle were appointed a sub-committee " to agree upon the basis of a contract for a running arrangement between the company and the South-western, with directions to report to the general committee when an arrangement should be agreed upon." On the 4th of December, 1871, a proposition was submitted by that sub-committee to the officers of the South-western, and accepted by them. It was a proposition for a lease. But the sub-committee had no authority to agree for the Rock Island company to take a lease, and when, afterwards, they reported their action to the general committee, that committee refused to confirm it. It is vain, therefore, to contend that there was a lease, or any agreement for a lease, that can be enforced. And, even if there was, there is no evidence that one of its terms was that the rent should be sufficient for the payment, and should be applied to the payment of the Atchinson branch bonds.

It is next insisted on behalf of the appellants that the Rock Island company could not ask for a foreclosure of the mortgages until it had accounted for and applied the stock of the South-western company to its indemnification for its guaranty, for which purpose it held such stock as security. The company did hold a large amount of that stock. Whether it held it as an indemnity for the liabilities it had assumed, we do not care to inquire. Assuming that it did, the fact is quite

immaterial. It surely cannot be maintained that a surety who held several securities for his indemnity cannot use one of them because he has another to which he might resort.

The fifth particular in which the decree is alleged to have been erroneous is, that it denied the relief for which the appellants prayed in their cross-bill. That relief was the enforcement of what is called the lease contract of Dec. 4, 1871, or the enforcement of the contract of July 27, 1871, by a lease of the branch line, on terms and conditions to be derived from the contract of Oct. 1, 1869; that is to say, the rental to be paid by the Rock Island company to be an amount sufficient to guarantee the principal, or at least the interest, of the Atchinson branch bonds. The answer to this is what we have heretofore said. There was no lease, nor any contract which bound the Rock Island company to take a lease, much less to pay a rental sufficient to guarantee the principal or interest of the Atchinson branch bonds, or to apply the rent to the payment of that principal or interest.

The appellants also, in their cross-bill, prayed in the alternative that the bonds of the branch road, held by them, might be deemed to have been obtained under false and fraudulent pretences, and that the proceeds thereof were paid out by the Rock Island company knowingly, fraudulently, and in violation of a trust assumed by them, and that the said company might be decreed to pay to them the par value of the same and interest.

We have sought in vain for any evidence that would justify a decree that the Rock Island company obtained the bonds of the branch road by fraudulent pretences, or that it knowingly, fraudulently, and in violation of any trust assumed by it, paid out the proceeds of sale of the bonds. By the provisions of the branch mortgage the Rock Island company was made the custodian of the bonds, with power and direction to pay them and their proceeds to the president or other duly authorized agent of the South-western company, in three contingencies: First, upon the delivery of an invoice of articles purchased, approved by the president; second, upon the presentation of monthly estimates by the engineer of the South-western of work done and materials fur-

nished in the construction of the branch railway, approved in the same manner; and, third, on the certificate of the same engineer, approved in like manner, that the road had been completed and was in running order. If this constituted a trust, it was only that of a custodian. The Rock Island company had no right to control the location of the branch road, or the cost of its construction. It was not its duty to supervise the contracts or direct the alignment. Such action would have been outside of its corporate power. If some persons who were its officers undertook to control the expenditure in such a manner as to secure a proper location and construction of the road (of which we discover no sufficient evidence), those persons may be responsible for their breach of duty, if there was any. But no such trust was assumed by the Rock Island company. Certainly, then, there was no undertaking that the branch road should be fifty miles long; and, if it was imperfectly constructed, it appears that the Rock Island company has expended upon its construction a very large sum of its own money, and has made it a first-class Western road. If, then, there was such a trust, as is charged by the appellants, and a breach of it, full compensation has been made, and the appellants have all the security the trust was intended to give them; *i.e.*, a first mortgage upon a finished first-class road.

The last objection to the decree is, that the relief prayed for by the cross-bills of the two defendant railroad companies should not have been granted, for the following reasons: 1st, If the original suit fails for want of jurisdiction, so must the cross-bills. 2d, The cross-bills were nullities, because filed without leave of the court, and because not making the intervening bondholders parties. 3d, Because collusive. We have seen the court had jurisdiction of the original suit. The permission of the court to file the cross-bills must be presumed from its action upon them, and the intervening bondholders were not parties or necessary parties when the bills were filed. They became parties to the original bill, but they did not ask to be made parties to the cross-bills of the defendant corporations. That the cross-bills were collusive in their origin, purpose, and conduct, if such was the fact, which we do not perceive, is of no importance, since the appellants had an unobstructed opportu-

nity to vindicate their rights. They might, if they had chosen, have ·become parties defendant to. the cross-bills, and, if they had, they could not have resisted the relief given by the court.

The appellants are, no doubt, unfortunate. It may be that they purchased their bonds expecting that the Rock Island company would protect them, either by taking a lease of the branch road, or by holding the purchase-money of the bonds and expending it for their security. But the expectation of a guaranty cannot be treated as a guaranty itself.                    *Decree affirmed.*