GUARANTEE TRUST & SAFE-DEPOSIT CO. v. DELTA & PINE-LAND CO. et al.

(Circuit Court of Appeals, Fifth Circuit. May 30, 1900.)

No. 913.

1. QUIETING TITLE—TITLE OF COMPLAINANT TO SUPPORT SUIT.
   Although one out of possession may be authorized, under a state statute, to bring an action in a federal court to quiet title or remove a cloud, it is essential to his right to relief that he established the legal title in himself.

2. COURTS—JURISDICTION TO CONVEY REAL ESTATE—LANDS IN ANOTHER STATE.
   While a federal court of equity may compel a conveyance of lands in another state by a decree in personam against a party who holds the title, it has no jurisdiction to itself transfer the title to such lands by a sale and conveyance made through its master or commissioner.

3. EQUITY—LACHES—SUIT TO REMOVE CLOUD ON TITLE.
   Where the defendants, in a suit in a federal court to quiet the title to unoccupied lands and for the cancellation of certain conveyances as clouds upon complainant's title, claim through conveyances based upon sales for taxes, some of which were executed 25 years before the commencement of the suit, and the latest 9 years before, the court will refuse relief to the complainant on the ground of laches, without regard to the state statute of limitations, and although fraud is charged, where no adequate excuse is shown for the delay.

Appeal from the Circuit Court of the United States for the Southern District of Mississippi.

The court adopts, with some changes and modifications, the statement of the case prepared by counsel for the Delta & Pine-Land Company.

The Guarantee Trust & Safe-Deposit Company filed the bill in equity in this case on March 4, 1898, in the United States circuit court for the Western division of the Southern district of Mississippi, against the Delta & Pine-Land Company, the Yazoo & Mississippi Valley Railroad Company, the Delta Development Company, and others. This proceeding involves the question of the titles to the lands in controversy, consisting of many large tracts of wild and unoccupied timber lands situated in several counties of the state of Mississippi. The appellant claims that its title to all the lands in controversy is paramount, and insists that the claims of title made by the appellees, respectively, are simply clouds upon its title, and should be canceled and annulled. The appellees claim different tracts of lands in severalty, but their titles are all derived through a common source. To this bill the appellees, the Delta & Pine-Land Company, the Yazoo & Mississippi Valley Railroad Company, and the Delta Development Company, filed general demurrers. The original bill was then amended, and the demurrers were applied to the bill as amended. The circuit court sustained the demurrers, and, the complainant declining to further amend its bill, the original and the amended bills were dismissed, from which decree the present appeal was taken.

The Appellant's Claim of Title.

It appears from the statements of the bill that these lands were donated to the state of Mississippi by the act of congress of September 28, 1850.

Between the years 1854 and 1860 they were sold and conveyed by the state to J. C. Griffing, Jacob Thompson, and others. On November 23, 1859, the Memphis, Holly Springs & Mobile Railroad Company was incorporated by the state of Mississippi. The company was only authorized to own land necessary for the use of the road, except that it might hold lands conveyed to it by way of security for or in satisfaction of debts, or by donation, for a period not exceeding five years after the completion of the road. By the nineteenth section of its charter, the property of the company was exempted from taxation until the completion of its road, provided the work of construction was commenced within two years, and completed within ten years, from the date of the passage of the act. By section twenty-one of said act, the work of construction was to be commenced within three, and completed within twelve, years from the passage of the act. Similar statutes incorporating said company were passed by the states of Tennessee and Alabama. On February 20, 1867, the act of September 28, 1859, was revived by the legislature of the state of Mississippi, and the name of the company changed to the Memphis, Holly Springs, Okolona & Selma Railroad Company. This act authorized the company to acquire and own lands within five miles of its road, provided they were acquired by subscriptions for stock. On December 31, 1868, the Selma, Marion & Memphis Railroad Company was incorporated by the state of Alabama, and within three years began the construction of its road. On July 21, 1871, the Mississippi legislature passed an act changing the name of the Memphis, Holly Springs, Okolona & Selma Railroad Company to the Selma, Marion & Memphis Railroad Company, and authorized the company to receive lands located anywhere in the state in subscription to its stock. The Alabama, Tennessee, and Mississippi companies were afterwards consolidated under the name of the Selma, Marion & Memphis Railroad Company. In the year 1871 the lands in controversy were sold and conveyed by Griffing, Thompson, and others to the Selma, Marion & Memphis Railroad Company in subscription to stock. Prior to the transfer of the lands to the railroad company by Griffing, Thompson, and associates, they had been sold for the nonpayment of state and county taxes, and bought by the state in the years 1860, 1861, 1862, 1864, 1866, and 1868. On March 16, 1872, the Mississippi legislature passed an act providing that the auditor of the state should convey, for two cents per acre, all the lands which had been acquired by the said railroad company from Griffing, Thompson, and others, and which were then held by the state under sales for taxes, upon the condition that 25 miles of the road was completed. And it provided, further, that, where the lands were held or claimed by any of the levee boards, the levee boards should arrange for the payment in levee bonds of any levee taxes that were due on the lands. On March 18, 1873, the auditor of the state conveyed these lands to the Selma, Marion & Memphis Railroad Company, finding that said railroad company had acquired said lands from the original owners, and had constructed 25 miles of its road. On March 18, 1871, the three railroad companies having consolidated as stated, the consolidated company, to wit, the Selma, Marion & Memphis Railroad Company, executed a mortgage on its railroad franchises and equipment, and also on these detached lands, to secure a bonded debt of $4,400,000. On December 18, 1874, Luke P. Blackburn, one of the holders of the mortgage bonds, for himself and the other mortgage creditors, filed a bill to foreclose this mortgage in the United States circuit court for the Western district of Tennessee. On June 3, 1879, a decree was made in said proceeding, under which, on June 1, 1880, the railroad proper and its equipment, with all the franchises of the railroad company, was sold, and purchased by J. J. Busby and other persons associated with him, who soon afterwards organized themselves, under the Mississippi statute of March 16, 1877, as the Memphis, Selma & Brunswick Railroad Company. A decree was afterwards made on July 24, 1883, by the United States circuit court at Memphis, in the foreclosure proceeding, for the sale of these lands, and at said sale, made in front of the federal building in the city of Memphis, by the proper officers of the court, the Memphis, Selma & Brunswick Railroad Company became the purchaser, to which a deed therefor was properly executed and delivered, and the sale and the deed executed thereunder were duly ratified

and confirmed by the court. On February 10. 1884, Jacob Thompson and others filed a bill in equity in the United States court at Oxford, Miss., against the Memphis, Selma & Brunswick Railroad Company, and under this proceeding these lands were sold and purchased by Martin Kelly, O. H. P. Piper, W. P. Dunivant, and others. These purchasers then conveyed the lands to the Memphis, Birmingham & Atlantic Railroad Company. The Memphis, Selma & Brunswick Railroad Company afterwards conveyed the lands to the appellant, in discharge of an indebtedness amounting to more than $600,000, and also procured a quitclaim deed to be made to the appellant by the Memphis, Birmingham & Atlantic Railroad Company. It is thus seen that the appellant claims title to the lands in controversy through the Selma, Marion & Memphis Railroad Company, and through the Memphis. Selma & Brunswick Railroad Company, the purchaser at the sale made under the decree of the United States circuit court for the Western district of Tennessee.

## The Titles of the Appellees.

The averments of the bill in respect to the claim of title of the appellees are not clear and specific, but the following facts relating to their titles may be gathered from the statements of the amended bill: In paragraph 8 of the amended bill it is stated that the larger part of these lands had been sold at tax sales and purchased by the state in the years 1860, 1861, 1862, 1864, 1866, and 1868. And it is also stated in this paragraph that a small portion of the lands had been sold at levee tax sales to the levee boards. This is explained more fully in the fourteenth paragraph of the amended bill, which states, in effect, that the defendants claim as their source of title that all the lands were sold at liquidating levee tax sales, made at different times from the year 1858 to the year 1873, and were struck off to the board of levee commissioners. These titles were subsequently acquired by purchase from the liquidating levee commissioners, severally, by E. C. Gordon and the Memphis & Vicksburg Railroad Company, at a sale made under a decree rendered by the chancery court of Hinds county in the suit of Green against Gibbs et al. The lands purchased by E. C. Gordon were afterwards bought by the Delta & Pine-Land Company, and those purchased by the Memphis & Vicksburg Railroad Company were subsequently acquired by the Yazoo & Mississippi Valley Railroad Company. The other defendants in the case purchased the lands claimed by them, respectively, from the Delta & Pine-Land Company and the Yazoo & Mississippi Valley Railroad Company. The lands were sold by Gibbs and Hemmingway, liquidating levee commissioners, under the decree of the chancery court of Hinds county, Miss., in the above-mentioned equity suit brought by Joshua Green and others against said commissioners. The purpose of the proceeding, which was begun prior to the year 1884, was to enforce the payment of the liquidating levee bonds issued under the act of February 13, 1867, by a sale of these lands then held in trust by the liquidating levee commissioners for the security of the bonds under the terms of said act. The lands were sold in 1875 for the general state and county taxes of the year 1874, under the act of March 1, 1875, commonly known as the "Abatement Act," and were bought in by the state. All the lands were again sold at tax sales in the year 1883 for the general current state and county taxes of the year 1882, and were purchased by the state. On March 14, 1884, an act was passed by the legislature of the state giving the purchasers from the liquidating levee commissioners under the decree in the case of Green against Gibbs and Hemmingway, liquidating levee commissioners, an exclusive option to purchase said lands from the state within 12 months from the date of the passage of the act, upon payment of the taxes due on the lands. Under this statute the lands were sold and conveyed by the state to the vendors of the defendants. On March 2, 1888, an act was passed by the legislature of Mississippi for the benefit of the purchasers under the decree in the case of Green against Gibbs and Hemmingway, providing, among other things, that the auditor should execute deeds from the state to said purchasers from the liquidating levy commissioners, upon payment of the taxes which accrued subsequent to their said purchase, which should convey the title to the lands, and have the effect of releasing all taxes which accrued prior to the purchase under said decree, and that any

error or miscalculation of the auditor should not have the effect of invalidating the title, but that the land should be liable for any such deficiency in the amount stated. The deed of the auditor of the state was made prima facie evidence of the validity of the title to the land conveyed. After July 1, 1888, deeds were made by the auditor to the appellees under the provisions of this act.

T. D. Young, for appellant.

Edward Mayes, Frank Johnston, and T. A. McWillie, for appellees.

Before PARDEE and SHELBY, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge (after stating the facts as above). The questions submitted for our determination arise upon the ruling of the circuit court in sustaining the demurrers interposed by the appellees to the original and amended bills of complaint. The fourth cause of demurrer assigned by the appellees claims that the sale made under the decree of the United States circuit court for the Western district of Tennessee was void because the court was without jurisdiction to order the sale of lands situated within the state of Mississippi. The appellant, as a subsequent purchaser of the lands, relies upon the deed which was executed pursuant to the Tennessee decree as an indispensable link in its chain of title. It is obvious, therefore, that if that deed did not pass the legal title, the appellant is without standing in court; for although, under the laws of Mississippi (Code 1892, § 500), a bill may be maintained in the circuit court of the United States by a person not in possession against another who is also out of possession, as is the case here, "still this does not make the complainant's rights any the less dependent upon title in him, nor does it put him in a position to have a cloud removed from a title which has no existence." Dick v. Foraker, 155 U. S. 415, 15 Sup. Ct. 124, 39 L. Ed. 201. In Holland v. Challen, 110 U. S. 25, 3 Sup. Ct. 501, 28 L. Ed. 56, it was said: "Undoubtedly, as a foundation for the relief sought, the plaintiff must show that he has a legal title to the premises;" and in Frost v. Spitley, 121 U. S. 557, 7 Sup. Ct. 1132, 30 L. Ed. 1012: "The necessary conclusion is that Spitley, not having the legal title of the lots in question, cannot maintain his bill for the purpose of removing a cloud on the title."

It is shown by the bill that the proceeding in the United States circuit court for the Western district of Tennessee was instituted by Luke P. Blackburn against the Selma, Marion & Memphis Railroad Company. That company had issued interest-bearing bonds amounting to $4,400,000 for the purpose of constructing, equipping, and putting in operation its line of railway contemplated to extend into the states of Tennessee, Alabama, and Mississippi; and, to secure the payment of the bonds, it duly executed, on the 18th day of March, 1871, a mortgage, conveying to trustees "all its rights and franchises, together with all property and real estate, its depots, warehouses, roadbeds, and all and every description of property, real and personal, which it then owned, or might thereafter acquire, either by donation, subscription, or purchase." The lands in controversy,

which were wild, outlying lands, situated in several counties of the state of Mississippi, and which had been conveyed to the railroad company by stockholders in payment of their subscriptions to the capital stock of the company, were embraced in the mortgage executed as above mentioned to trustees. As one of the bondholders, Blackburn filed his bill on behalf of himself and others on December 18, 1874, and the trustees in the mortgage and all proper and necessary parties were brought before the court. On the 3d day of June, 1879, a decree of foreclosure was passed, under and by virtue of which, on June 1, 1880, "all the rights, franchises, roadbeds, depots, and equipments of the road were sold and bought by J. J. Busby" and associates. But the lands in controversy were not included in this sale. "After," it is alleged in the amended bill, "all proper interlocutory orders and decrees had been regularly taken and entered in the case, to wit, on the 24th day of July, 1883, a decree was duly entered in said cause, under and by which the lands acquired by the Selma, Marion & Memphis Railroad Company [the same as involved herein] were, after due advertisement, sold in legal subdivisions by the proper officers of the court in front of the federal court building in the city of Memphis, and were bought by the said Memphis, Selma & Brunswick Railroad Company, to whom a deed therefor was properly executed and delivered, and which sale and deed thereunder was confirmed by proper order of the court." It is not distinctly alleged what officer of the court sold the lands. Counsel for the appellant, on page 2 of his brief, states that the sale was made by the clerk of the court; but, as such sales are ordinarily made in chancery suits by a master or commissioner, the natural meaning of the allegation, that the lands were "sold by the proper officers of the court," would be that the sale was effected by the officers usually authorized to make it, to wit, a master or commissioner. And it may be said that "a sale made by a special master, under the direction of a court of chancery, is not a sale made by either of the parties to the litigation or under his direction. The master is a representative of the court, as a marshal or sheriff is in an action at law. He is not under the control of either party. He is not the agent of either to make the sales." Mining Co. v. Mason, 145 U. S. 361, 362, 12 Sup. Ct. 887, 36 L. Ed. 732, citing authorities.

It will thus be observed that the decree in Blackburn v. Railroad Co. (C. C.) 3 Fed. 689, did not operate directly upon the trustees or the railroad company, by requiring conveyances to be made by them, but, partaking of the nature of a proceeding in rem, it acted immediately upon the property, and was to be executed through the instrumentality of independent officers appointed by the court. A writ of assistance, issued by the court in Tennessee to put the purchaser at the sale made by the master in possession of the property, would be wholly inoperative, because such process could have no extraterritorial effect. Toland v. Sprague, 12 Pet. 300, 9 L. Ed. 1093; Picquet v. Swan, 5 Mason, 40, Fed. Cas. No. 11,134; Ex parte Graham, 3 Wash. C. C. 456, Fed. Cas. No. 5,657; Chittenden v. Darden, 2 Woods, 437, Fed. Cas. No. 2,688; Walker v. Lea (C. C.) 47 Fed. 645. See, also, Pennoyer v. Neff, 95 U. S. 714, 24 L. Ed. 565.

Notwithstanding the want of power in a court of one state to deliver by its process the possession of land in another, it is nevertheless a recognized and accepted doctrine that a court of equity, sitting in a state and having jurisdiction of the person, may decree a conveyance by him of land in another state, and may enforce the decree by process against the defendant. Muller v. Dows, 94 U. S. 449, 24 L. Ed. 207; Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181; Pennoyer v. Neff, supra. In the case of Massie v. Watts, 6 Cranch, at page 159, and 3 L. Ed., at page 186, Mr. Chief Justice Marshall, after reviewing the English decisions, announced the general doctrine in the following language: "Upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, this court is of opinion that in a case of fraud or trust or breach of contract the jurisdiction of a court of chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree." In such cases the decree operates upon the person, not upon the thing, and the person is required to execute it under the pains and penalties of contempt for disobedience. Where, however, it is sought by the decree to effect a transfer of the title to land lying within another jurisdiction, by directing its sale by a master, who is not clothed with the title, the decree in such case operates upon the thing, and does not devest the title of the owner; the master being, as we have seen, a mere representative of the court, not under the control of either party, nor the agent of either to make the sale. In the case last mentioned the deed is simply inoperative to pass the title; for, to judicially devest the title to real estate out of one person and place it in another, the holder of the title must be before the court, and the decree must operate upon the person by requiring him to make the conveyance. This principle is elementary, and should have special application to decrees rendered by the courts of one state authorizing the transfer of title to lands lying within the limits of another state.

In Watts v. Waddle, 6 Pet. 389, 8 L. Ed. 437, the facts, briefly stated, were as follows: Watts, in order to obtain the legal title to a tract of land claimed by Robert Powell's heirs, instituted a suit in chancery in the United States circuit court for Kentucky against the heirs, and obtained a decree for the land. In pursuance of the decree, a commissioner appointed by the court executed to Watts a conveyance. The question, among others, arose whether the decree vested in Watts the legal title. At pages 400, 401, 6 Pet., and page 442, 8 L. Ed., the court said:

"But the most decisive objection to the decree against Powell's heirs is, it is contended, that it does not vest the legal title in Watts. A decree cannot operate beyond the state in which the jurisdiction is exercised. It is not in the power of one state to prescribe the mode by which real property shall be conveyed in another. This principle is too clear to admit of doubt; but it is insisted that the decree executed by the commissioner under the decree, by virtue of a statute of Kentucky, was a legal conveyance in that state, and as such, by a statutory provision, is good in Ohio. The words of the statute referred to are 'that all deeds, mortgages, and other instruments of writing for the conveyance of lands, tenements and hereditaments, situate, lying and being within this state, which hereafter may be made and executed, and acknowl-

edged or approved in any other state, territory or country, agreeably to the laws of such state, territory or country, or agreeably to the laws of this state, such deed, mortgage, or other instrument of writing shall be valid in law.' The deed executed by the commissioner in this case must be considered as forming a part of the proceedings in the court of chancery, and no greater effect can be given to it than if the decree itself, by statute, was made to operate as a conveyance in Kentucky, as it does in Ohio. The question then arises whether, by a fair construction of the above provision, it is in the power of a court of equity, sitting in Kentucky, by force of its decree, to transfer real estate in Ohio. Can this effect be given to such decree by this statute? It is believed that no state in the Union has subjected the real property of its citizens to the exercise of such a power. Neither sound policy nor convenience can sustain this construction, and, unless the language of the statute be imperative, no court can sanction it. The legislature of Ohio could never have intended, by this provision, to place the real property of the citizens of that state at the disposition of a foreign court. The language used in the act does not require such a construction. It refers to deeds executed by individuals in any other state, and not to conveyances made by the decree of a court of chancery. This is the true import of the section, and it does not appear that the courts of Ohio have given it a different construction. Thus construed, it promotes the convenience of nonresidents who own lands in Ohio, and may desire to convey them, and in no point of view can it operate injuriously to the interests of citizens of the state. In this view, it appears that Watts did not acquire the legal title from Powell's heirs, under the deed of the commissioner, and consequently he was unable to convey the legal title to Waddle."

In Watkins v. Holman, 16 Pet. 23, 10 L. Ed. 873, an administratrix, having duly taken out letters of administration in Massachusetts, was licensed and empowered by the Massachusetts court to make a deed to lands situated in Alabama. Discussing the validity of this deed, Mr. Justice McLean, speaking for the court (at page 57, 16 Pet., and page 886, 10 L. Ed.), said:

"That this deed is inoperative is clear. It was executed by the administratrix under a decree or order of the supreme court in Massachusetts and by virtue of a statute of that state. The proceeding it is not pretended was authorized by any law of Alabama. And no principle is better established than that the disposition of real estate, whether by deed, descent, or by any other mode, must be governed by the law of the state where the land is situated. A court of chancery, acting in personam, may well decree the conveyance of land in any other state, and may enforce their decree by process against the defendant. But neither the decree itself, nor any conveyance under it, except by the person in whom the title is vested, can operate beyond the jurisdiction of the court."

The principle is clearly stated by the court, through Mr. Justice Field, in Corbett v. Nutt, 10 Wall., at page 475, and 19 L. Ed., at page 979:

"In this case it appears to be conceded that the supreme court of the District of Columbia exceeded its authority in appointing McPherson trustee in place of Nutt of the land in Virginia. That court could not, by the mere force of its decree, transfer the title to land lying without its jurisdiction from the party in whom it was vested by the will of Mrs. Hunter. A court of equity, acting upon the person of a defendant, may control the disposition of real property belonging to him situated in another jurisdiction, and even in a foreign country. It may decree a conveyance, and enforce its execution by process against the defendant; but neither its decree, nor any conveyance under it, except by the party in whom the title is vested, is of any efficacy beyond the jurisdiction of the court. This is familiar law, and was declared by this court in Watkins v. Holman, the court observing that 'no principle was better established than that the disposition of real estate, whether by deed,

descent, or by any other mode, must be governed by the law of the state where the land is situated.' "

Boyce v. Grundy, 9 Pet. 275, 9 L. Ed. 127, was a case where the United States circuit court for the district of West Tennessee had rendered a decree which created a lien upon land in Mississippi, and ordered a sale of the land to be made in Mississippi in discharge of the lien. In holding the decree erroneous, the court, among other things, said:

"Another objection is, to that part of the decree which creates a lien upon the land in controversy lying in another state, and decrees a sale for a discharge of the lien. We are of opinion that the decree is erroneous in this respect. In the first place, the court had no jurisdiction to decree a sale to be made of land lying in another state by a master acting under its own authority." Story, Confl. Laws, § 543.

The principle thus declared has been adhered to and emphasized by the state courts in the following cases: Poindexter v. Burwell, 82 Va. 507; Wimer v. Wimer, Id. 890, 5 S. E. 536; Farmers' Loan & Trust Co. v. Postal Tel. Co., 55 Conn. 334, 11 Atl. 184; Robinson v. Johnson (Tenn. Ch.) 52 S. W. 704; Burnley v. Stevenson, 24 Ohio St. 474; Page v. McKee, 3 Bush, 135.

We quote from but one of the cases last cited. In 55 Conn., at page 335, and 11 Atl., at page 185, the supreme court of errors of Connecticut made the following statement of the principle:

"The courts of our state will not recognize the right of courts in other states to affect directly the title to real estate in the former. The most that can be done is to allow foreign courts having jurisdiction of the parties to compel conveyances by the owner, and recognize as valid titles so acquired. We are aware of no case that has gone so far as to recognize the validity of a deed given by a referee or other officer of court by authority of law in another jurisdiction. The rule seems to be that the courts of each state have exclusive jurisdiction to settle the title to lands within its own limits."

But it is claimed by counsel for the appellant that Muller v. Dows, 94 U. S. 444, 24 L. Ed. 207, has overruled or modified the earlier cases decided by the supreme court. In this view we are unable to concur. The suit in that case was brought by the trustees named in the mortgage. The Chicago & Southwestern Railway Company was one of the defendants. A part of its railway was in Missouri, and the mortgage which the bill sought to have foreclosed covered that part, as well as the part in the state of Iowa. The court decreed a sale of the entire property covered by the mortgage, and directed the master, who was ordered to make the sale, to execute a deed to the purchaser. The mortgagor was also directed to make a conveyance to the purchaser in further assurance. Upon appeal the decree was affirmed. It will be observed that the railway, extending into two states, was sold in its entirety; that the trustees were complainants in the suit seeking a sale of the property; and that the mortgagor was required also to execute a deed to the purchaser. The court seemed to lay stress upon the fact that the sale was made at the instance of the trustees, who, notwithstanding the appeal, could also be directed by the trial court to join in a conveyance. In discussing the question the court (at page 450, 94 U. S., and page 209, 24 L. Ed.) observed:

"The mortgagors here were within the jurisdiction of the court. So were the trustees of the mortgage. It was at the instance of the latter the master was ordered to make the sale. The court might have ordered the trustees to make it. The mortgagors who were foreclosed were enjoined against claiming property after the master's sale, and directed to make a deed to the purchaser in further assurance, and the court can direct the trustees to make a deed to the purchaser in confirmation of the sale. We cannot, therefore, declare void the decree which was made."

The case of McElrath v. Railroad Co., 55 Pa. St. 189, cited with approval in Muller v. Dows, supra, and relied upon by the appellant, is in harmony with the views which we have expressed. There the trustee in the mortgage, who had brought the suit, was authorized to sell a railroad which was partly in West Virginia and partly in Pennsylvania. And in making the order the court used this language:

"Without deciding what estate would pass by the trustee's sale under the mortgage, we are of opinion that we can by our decree, operating upon the trustee himself, authorize and compel him to sell and convey whatever interest of the railroad company will pass under the terms of the mortgage."

In the present case the validity of the sale of the Selma, Marion & Memphis Railroad is not in question. That road, with all its rights, franchises, roadbeds, depots, and equipments, was sold on June 1, 1880, more than three years prior to the sale of the lands in controversy, and with its sale we have no concern. It was under the decree of July 24, 1883, that the lands were sold, all being wild and uncultivated, and all situate in the state of Mississippi. Thus Muller v. Dows is clearly distinguishable from this case. Not only so; in Blackburn v. Railroad Co. a bondholder brought the suit, and the trustees in the mortgage were made defendants. Neither the trustees nor the mortgagor were required to execute conveyances to the purchaser, and the sale rests alone for its validity upon the deed of an officer of the court, presumably a master, executed pursuant to the court's decree.

Our conclusion is that the deed of the master did not pass the legal title of the Selma, Marion & Memphis Railroad Company to the lands so attempted to be conveyed.

We might well rest our decision upon the question above discussed. But there is another objection, apparent upon the face of the original and amended bills of complaint, which is fatal to the appellant's right of recovery in this proceeding. The lands in controversy were conveyed by the state of Mississippi to Jacob Thompson and associates between the years 1854 and 1860, and by the latter transferred to the Selma, Marion & Memphis Railroad Company in 1871. Before, however, the execution of the deed by Thompson and associates, the lands had been sold for the nonpayment of taxes, and bought in by the state in the years 1860, 1861, 1862, 1864, 1866, and 1868. By an act of the legislature of Mississippi passed on March 16, 1872, the auditor of the state was authorized, upon certain prescribed considerations, to convey to the railroad company the lands which had been previously transferred to it by the Thompson deed. Pursuant to this legislative enactment, the auditor, on March 18, 1873, conveyed to the railroad company such title as the state possessed. It was by virtue of the

deeds above recited that the Selma, Marion & Memphis Railroad Company held its title, which, as we have seen, was attempted to be passed to the Memphis, Selma & Brunswick Railroad Company by the master's deed in 1883. Subsequently, and for a valuable consideration, the appellant acquired the title of the last-named company. It is further shown by the bills that the titles of the appellees had their inception in purchases of the lands, in 1873, by the board of liquidating levee commissioners, at sales at which they were sold for delinquent taxes accruing for the years 1858 to 1873. Under an act of the legislature passed in 1875, and known as the "Abatement Act," the lands were again sold for nonpayment of taxes due for 1874 and purchased by the state, and it is charged that the appellees rely upon that purchase by the state as one of their sources of title. On February 20, 1877, Joshua Green, as a holder of bonds issued by the board of liquidating levee commissioners, filed on behalf of himself and others a bill in the chancery court of Hinds county, Miss., against W. H. Gibbs, auditor, and W. L. Hemmingway, treasurer, of the state, as the successors of the rights, powers, and liabilities of the board of liquidating levee commissioners, by which it was sought to have the lands previously purchased by the board at tax sales, as above mentioned, sold, and the proceeds applied to the payment of the bonds. A decree was rendered ordering a sale of the lands, and upon appeal to the supreme court of the state the decree was affirmed. The lands were sold in obedience to the decree, and the title thereby acquired passed by subsequent mesne conveyances to the appellees. But, the appellees failing to pay the taxes due for the year 1882, the lands were again sold for the delinquent taxes, and the state became the purchaser. It is further charged that the appellees thereafter procured the passage of two acts by the legislature of Mississippi, one in 1884 and the other in 1888, under and by virtue of which deeds were executed by the auditor conveying to the appellees the state's title, the deed, under the latter act, having been executed after July 1, 1888. It will also be noted that the bills charge fraud and collusion in the institution and prosecution of the suit of Green against Gibbs and Hemmingway, as well as in reference to the subsequent nonpayment of taxes and the passage of the act of 1884. The bills charge that the sales, judicial decrees, legislative acts, and all other evidences and muniments of title relied upon by the appellees are nullities, and seek to have them canceled, and the cloud thereby operating upon its title removed. It will thus be observed that 25 years after the acquisition of the title to the lands by the board of liquidating levee commissioners, approximately 20 years after their purchase by the appellees under the decree in the suit of Green against Gibbs and Hemmingway, and more than 9 years after the execution of the deed to the appellees by the auditor of the state under the act of 1888, the appellant seeks for the first time to vacate the tax deeds, judicial proceedings, and legislative enactments which culminated in its divestiture of title, without tendering anything approaching an adequate excuse for its long continued silence. It does make a feeble attempt to justify or excuse its delay on the ground that, under its charter of incorporation, the Selma, Marion & Memphis Railroad Company was

thought by counsel to be exempt from the payment of taxes. Acting under this belief, the appellant alleges that, being a nonresident corporation with no agents in the state of Mississippi, it gave the matter no immediate attention until its supposed period of exemption was about to expire. It does appear, however, by plain inference from the allegations, that it was advised that the tax exemption would expire about the year 1884, and yet it failed to act until the year 1898. While fraud is charged in the bills, no reason is given for its failure to act promptly upon its discovery. It further attempts to explain its laches upon the theory that the suit of Ford v. Land Co. (C. C.) 43 Fed. 181, which involved questions similar to some of those involved in the present litigation, relieved it from the necessity of proceeding earlier in the assertion of its rights. But it is obvious that reliance cannot be placed on that suit to excuse the negligence of the appellant, because it is expressly alleged in the amended bill that the decision in Ford v. Land Co. "was in no way conclusive against it, as many questions of both law and fact, which it here relies upon, were not passed upon, or even presented, in that case."

Without, therefore, deciding whether the present suit is barred by the statutes of limitation of Mississippi, we are clearly of opinion, in view of the facts of this case, that a court of equity should not grant relief to the appellant at this late day. The delay has been too prolonged to invoke the aid of the chancellor, since "nothing can call forth this court in activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing." Sullivan v. Railroad Co., 94 U. S. 806, 24 L. Ed. 324; Brown v. Buena Vista Co., 95 U. S. 157, 24 L. Ed. 422; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Badger v. Badger, 2 Wall. 87, 17 L. Ed. 836; Pennsylvania Mut. Life Ins. Co. v. City of Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626, citing numerous authorities. In Badger v. Badger, 2 Wall. at pages 94, 95, and 17 L. Ed., at page 838, the rule is stated by Mr. Justice Grier, speaking for the court, in the following language:

"Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statutes of limitation which govern courts of law in like cases, and this rather in obedience to the statutes than by analogy. In many other cases they act upon the analogy of the like limitation at law. But there is a defense peculiar to courts of equity founded on lapse of time and the staleness of the claim, where no statute of limitation governs the case. In such cases, courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, and refuse to interfere where there has been gross laches in prosecuting the claim, or long acquiescence in the assertion of adverse rights. Long acquiescence and laches by parties out of possession are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the parties in possession, which will appeal to the conscience of the chancellor. The party who makes such appeal should set forth in his bill specifically what were the impediments to an earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise, the chancellor may justly refuse to consider his case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitation contained in the answer."

In concluding our consideration of this case, we take the liberty of commending to the appellant an attentive perusal of the opinion in Ford v. Land Co., 164 U. S. 662, 17 Sup. Ct. 230, 41 L. Ed. 590, where the question of title to the lands in controversy seems to have been adjudicated in favor of the appellees. If that case be not decisive of this, it falls short of the danger line by scarcely a hair's breadth. The decree of the circuit court is affirmed.